Petition to reinstate appeal, p. 2. We note, however, explanatory note to Pa.R.C.P.D.J. 1005 provides:

> As to subdivision B, there is no return receipt requirement for service by certified or registered mail and consequently no such receipt need be filed with the prothonotary, although if service is by certified or registered mail the sender's receipt must be attached to the proof of service.

Pa.R.C.P.D.J. 1005 (emphasis added).

In the instant case, it is clear that appellant misinterpreted the dictates of Pa. R.C.P.D.J. 1005. Appellant believed that the sender's receipt was in fact the return receipt. Although appellant did not technically comply with Pa.R.C.P.D.J. 1005B, his misreading of the comment was a legitimate excuse, and therefore we find that he did make a good faith attempt to comply with the rule. Moreover, we note appellee suffered no prejudice. Consequently, the order dismissing the petition to reinstate the appeal is vacated and the appeal is reinstated. *See*

*also Slaughter v. Allied Heating*, 431 Pa.Super. 348, 636 A.2d 1121 (1993) (petition to reinstate appeal denied where nothing in the record indicated that appellee and the district justice received timely notice of appeal, but court explained "the mere failure to file the proofs of service in a timely manner will be disregarded where it is clear that the opposing party has received notice of the appeal and that the purpose of the rules has been satisfied."); *Delverme v. Pavlinsky*, 405 Pa.Super. 443, 447–48, 592 A.2d 746, 748 (1991) (where appellant made a good faith attempt to comply with the Pa.R.C.P.D.J. and in the absence of prejudice to appellee, the appeal was reinstated); *Anderson v. Centennial Homes, Inc.*, 406 Pa.Super. 513, 594 A.2d 737 (1991) (trial court's order denying appellant's motion to reinstate appeal affirmed where appellants provided no reasons for their omission); *Quarato v. Facelifters, Ltd.*, 305 Pa.Super. 536, 451 A.2d 777 (1982) (dismissal of appeal due to technical noncompliance with Pa.R.C.P.D.J. 1005B was vacated); and *Katsantonis v. Freels*, 277 Pa.Super 294, 419 A.2d 778 (1980) (court construed Rule 1005B liberally and reinstated appeal).

Order reversed and appeal reinstated.

**T.J.B., Appellee,**

v.

**E.C. and Thomas "Doe" and Donna "Doe".**

**Appeal of Thomas "DOE" and Donna "Doe", Appellants.**

**In re ADOPTION OF M.J.C., Appellee.**

**Appeal of Thomas "DOE" and Donna "Doe", the Persons who Filed the Report of Intention to Adopt, and Samuel C. Totaro, Jr., Esquire, Appellants.**

Superior Court of Pennsylvania.

Argued Oct. 4, 1994.

Filed Jan. 20, 1995.

Samuel C. Totaro, Bensalem, John S. Thome, Jr., Doylestown, for Thomas "Doe" and Donna "Doe".

Michael H. Applebaum, Bensalem, for T.J.B.

Robert H. Yaroschuk, Doylestown, for M.J.C.

John S. Thome, Jr., Doylestown, for E.E.C.

Before ROWLEY, President Judge, and KELLY and CERCONE, JJ.

KELLY, Judge:

In this appeal we are asked to determine whether the trial court erred in denying appellants', the pre-adoptive parents', Thomas Doe's and Jane Doe's, petition to involuntarily terminate the appellee's, the natural father's, T.J.B.'s, parental rights to M.J.C., a male infant less than six months old, and awarding legal and physical custody of M.J.C. to appellee instead of appellants. We hold that the trial court's denial of appellants' petition to involuntarily terminate appellee's parental rights to M.J.C. and its custody award were correct; M.J.C. shall remain in appellee's custody. Thus, we affirm.

The factual background and procedural history of this case are as follows. In March 1993, while incarcerated at the Montgomery County Correctional Facility at Eagleville, E.C., M.J.C.'s natural mother, learned that she was pregnant. At that time, E.C. contacted appellee and informed him that she was carrying his child. Appellee denied that he had impregnated E.C. and immediately requested that paternity tests be conducted.[1] This denial of paternity by appellee continued throughout E.C.'s pregnancy.

---

1. Paternity tests cannot be conducted on a child until after the child is born.

During the course of the next few months, E.C. made plans to put the child that she was carrying up for adoption. E.C. initially intended to place her child with a married couple whom she met through her sister-in-law. This couple subsequently retained the services of Samuel C. Totaro, Jr., Esquire, to represent them in the adoption process. After a financial dispute erupted between E.C. and the married couple regarding the medical expenses of child birth, E.C. refused to allow that couple to adopt her child. Consequently, Mr. Totaro introduced E.C. to appellants, another couple who wished to adopt her child and E.C. decided that she would allow appellants to adopt her child.

M.J.C. was born on August 13, 1993. Thereafter, on August 16, 1993, E.C. consented to M.J.C.'s adoption and M.J.C. was delivered to appellants by Mr. Totaro. M.J.C. resided with appellants for approximately the first six months of his young life. Appellants considered M.J.C. to be their child, despite the fact that only M.J.C.'s natural mother had consented to his adoption.

During the months of July and August, appellee received several letters and phone calls from Mr. Totaro soliciting his consent to appellants' adoption of M.J.C. Appellee did not respond to Mr. Totaro's inquiries because he continued to deny that he had impregnated E.C. Appellee refused to contemplate the decision of whether to consent to M.J.C.'s adoption unless he was sure that M.J.C. was his child.

Approximately one month after M.J.C.'s birth, appellee spoke with Mr. Totaro directly for the first time. Appellee continued to deny that he was M.J.C.'s natural father and requested that a paternity test be administered. On September 20, 1993, these tests were conducted, at appellee's expense, on appellee and E.C.; on September 22, 1993, they were conducted, again at appellee's expense, on M.J.C. Resultantly, in early November 1993, appellee learned that the paternity tests indicated that he was M.J.C.'s natural father.

By letter dated December 8, 1993, addressed to Mr. Totaro, appellee, through his original counsel in this matter, James Cunilio, Esquire, acknowledged paternity of M.J.C. for the first time. In this letter, appellee also informed appellants and Mr. Totaro that he would like to meet appellants and would not consent to M.J.C.'s adoption unless he could still have some access to M.J.C. Specifically, appellee demanded that an "open adoption" with scheduled visitations be established. Moreover, appellee informed appellants and Mr. Totaro that he would seek custody of M.J.C. within two weeks of the date of the letter if a visitation schedule was not immediately established. In response to appellee's December 8, 1993 letter, appellants, through Mr. Totaro, filed petitions with the trial court on December 13, 1993 to involuntarily terminate appellee's parental rights to M.J.C. and confirm E.C.'s consent to M.J.C.'s adoption. Neither of these petitions were served on appellee or E.C. until February 3, 1994 despite several written correspondences between Mr. Totaro and E.C. and Mr. Totaro and Mr. Cunilio in the later half of the month of December.

On December 14, 1993, the trial court issued a preliminary decree establishing January 9, 1994 as the date for the hearing regarding the petitions filed by Mr. Totaro on December 13, 1993 and ordering notice to be given to appellee and E.C. Subsequently, pursuant to Mr. Totaro's request for a continuance, on December 27, 1993, the trial court issued another preliminary decree. This second decree established February 9, 1994 as the date for the hearing regarding appellants' December 13, 1993 petitions and again ordered that notice be given to appellee and E.C. No contact occurred between appellants and appellee or appellants and E.C. from December 27, 1993 until January 28, 1994. By letter dated January 28, 1994, appellee, through new counsel, Michael H. Applebaum, Esquire, informed appellants that he would seek custody of M.J.C. The following day, E.C., in a letter addressed to Mr. Totaro, revoked her consent to the adoption of M.J.C. In this letter, E.C. expressed her desire to have M.J.C. placed in the custody of appellee.

A number of events then occurred on January 31, 1994. Appellants, through Mr. Totaro, petitioned the trial court to involuntari-

ly terminate E.C.'s parental rights to M.J.C.[2] Consequently, the trial court issued a preliminary decree establishing February 9, 1994 as the hearing date for appellants' petition to involuntarily terminate E.C.'s parental rights and ordering notice to be given to appellee and E.C. Appellee, through Mr. Applebaum, filed a complaint for custody of M.J.C. Appellants, through Mr. Totaro, also filed a petition with the trial court to consolidate their petitions to involuntarily terminate appellee's and E.C.'s parental rights to M.J.C. with appellee's custody complaint. Finally, the trial court issued an order consolidating appellants' involuntary termination petitions with appellee's custody complaint for trial purposes and staying the custody complaint. Prior to the issuance of the orders dated January 31, 1994, neither appellee nor E.C. were notified that appellants, through Mr. Totaro, had filed petitions to involuntarily terminate their parental rights to M.J.C. On February 3, 1994, Linda K. Caraccappa, Esquire, counsel for Mr. Totaro, served the following documents upon appellee's and E.C.'s counsel: the January 31, 1994 consolidation order; appellant's consolidation motion; the January 31, 1994 preliminary decree; and appellants' separate petitions to involuntarily terminate appellee's and E.C.'s parental rights to M.J.C.

The consolidated hearing took place on February 10, 1994, in which the trial court denied appellants' petitions to involuntarily terminate the parental rights of appellee and E.C. and awarded custody of M.J.C. to appellee effective February 14, 1994. In compliance with the February 10, 1994 order, M.J.C. was delivered to appellee on February 14, 1994 and is currently in appellee's custody. After considering appellants' post-trial motions, the trial court, on April 15, 1994, entered the February 10, 1994 order as a final decree.

Appellants filed a notice of appeal with this Court from the February 10, 1994 custody order on February 14, 1994.[3] On May 4, 1994, appellants filed a notice of appeal with this Court from the April 15, 1994 order entering the February 10, 1994 order denying appellants' petition to involuntarily terminate the parental rights of appellee and E.C. to M.J.C. as a final decree.[4] Subsequently, these appeals were consolidated by this Court.

In their consolidated appeals, appellants raise the following issues:

WHETHER PRE–ADOPTIVE PARENTS (APPELLANTS HEREIN) HAVE STANDING TO MAINTAIN CUSTODY OF A MINOR CHILD, WHEN THE PRE–ADOPTIVE PARENTS HAD FILED A REPORT OF INTENTION TO ADOPT THE SAID CHILD, AND THE CHILD HAD BEEN IN THEIR SOLE AND EXCLUSIVE PHYSICAL CUSTODY AND CARE FOR ALL BUT THE FIRST THREE (3) DAYS OF HIS LIFE AND FOR WHOM THEY STOOD IN LOCO PARENTIS, AND WHETHER THE LOWER COURT CAN ORDER A TRANSFER OF CUSTODY OF THE SAID CHILD FROM THE SAID PRE–ADOPTIVE PARENTS TO A NATURAL PARENT WITHOUT FIRST CONDUCTING A FULL EVIDENTIARY HEARING ON THE "BEST INTERESTS OF THE CHILD."

(Appellants' Superior Court Docket Number 427 Philadelphia 1994 Brief at 6).

SECTION [sic] 23 PA.C.S.A. SECTION 2711(a)(6) OF THE ADOPTION ACT APPLIES TO A NATURAL MOTHER WHO HAS PREVIOUSLY SIGNED A CONSENT, BUT LATER REVOKES IT IN ACCORDANCE WITH 23 PA.C.S. [sic] SECTION 2711(C).

IF A PUTATIVE FATHER KNOWS OF THE BIRTH OF A CHILD, HAS FAILED TO MARRY THE OTHER PARENT, HAS FAILED TO RESIDE WITH THE CHILD, AND DURING THE FOUR MONTHS IMMEDIATELY

---

2. By filing this petition, appellants impliedly revoked their earlier petition to confirm E.C.'s consent to M.J.C.'s adoption.

3. This appeal is designated Superior Court Docket Number 427 Philadelphia 1994.

4. This appeal is designated Superior Court Docket Number 1688 Philadelphia 1994.

PRECEDING THE FILING OF THE PETITION TO TERMINATE HIS RIGHTS HAS FAILED TO MAINTAIN SUBSTANTIAL AND CONTINUING CONTACT WITH THE CHILD AND HAS FAILED TO PROVIDE SUBSTANTIAL SUPPORT FOR THE CHILD, HIS PARENTAL RIGHTS SHALL BE TERMINATED UNDER SECTION 2511(a)(B) OF THE ADOPTION ACT.

(Appellants' Superior Court Docket Number 1688 Philadelphia 1994 Brief at 13 and 19).

Introductorily, we note that, pursuant to a properly filed petition, the trial court may terminate the rights of a parent with regard to a newborn child[5] when the parent:

knows or has reason to know of the child's birth, does not reside with the child, has not married the child's other parent, has failed for a period of four months immediately preceding the filing of the petition to make reasonable efforts to maintain substantial and continuing contact with the child and has failed during the same four-month period to provide substantial financial support for the child.

23 Pa.C.S.A. § 2511(a)(6). But, the class of people eligible to file a petition to terminate a parent's rights to his or her child is limited. A petition to terminate the parental rights of a child under eighteen years of age may only be filed by one of the following people:

(1) Either parent when termination is sought with respect to the other parent.

(2) An agency.

(3) The individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt).

23 Pa.C.S.A. § 2512(a)(1) through (3). The status of *in loco parentis* for purposes of filing a petition to involuntarily terminate the parental rights of a parent to his or her child has been aptly summarized by this Court as follows:

Pennsylvania courts recognize that a person may "put himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship with-

out going through the formality of a legal adoption. This status, known as 'in loco parentis' embodies two ideas; first, the assumption of a parental status, and second, the discharge of parental duties." *Commonwealth ex rel. Morgan v. Smith,* 429 Pa. 561, 565, 241 A.2d 531, 533 (1968). "The rights and liabilities arising out of that relation are, as the words imply, exactly the same as between parent and child."

*In re Adoption of J.M.E.,* 416 Pa.Super. 110, 114, 610 A.2d 995, 997 (1992), *allocatur denied,* 533 Pa. 612, 618 A.2d 402 (1992) (quoting *In re Crystal D.R.,* 331 Pa.Super. 501, 505, 480 A.2d 1146, 1148 (1984) (citations omitted)).

■ Instantly, the status of *in loco parentis* to M.J.C. must be allocated to appellants for the period in which M.J.C. was in their custody. From the time that he was three days old, appellants assumed parental status over and discharged parental duties towards M.J.C. Although appellants did not have the chance to complete the formal process necessary to adopt M.J.C., their relationship with him during the six months that he lived with them was exactly the same as the relationship that exists between parent and child. Appellants expected this relationship to be permanent. Further, appellants filed their report of intent to adopt M.J.C. on August 23, 1993. Therefore, appellants' ability to file a petition to terminate the parental rights of appellee and E.C. to M.J.C. cannot and was not contested.

Despite properly allowing appellants to petition for the involuntary termination of appellee's and E.C.'s parental rights to M.J.C., the trial court specifically found that appellants lacked standing to contest custody of M.J.C. Appellants, however, assert their standing to seek custody of M.J.C. for primarily the same reasons that they were allowed to petition for the involuntary termination of the parental rights of appellee and E.C.; they filed a report of intent to adopt M.J.C. and stood *in loco parentis* to M.J.C. Specifically, appellants assert their standing *in loco parentis* to M.J.C. because they as-

---

**5.** A newborn child is a baby less than six months of age. 23 Pa.C.S.A. § 2102.

sumed custody of M.J.C. on August 16, 1993, three days after his birth, until the trial court awarded custody of him to appellee in February 1994. Appellants emphasize that a strong emotional bond developed between themselves and M.J.C. because of the permanency that their relationship was supposed to encompass; appellants claim that they believed that M.J.C. would become their adoptive child. In support of these claims, appellants rely primarily on *Mitch v. Bucks County Children & Youth S.S. Agency*, 383 Pa.Super. 42, 556 A.2d 419 (1989), *allocatur denied*, 524 Pa. 621, 571 A.2d 384 (1989).

■ Although appellants' *in loco parentis* status qualifies them to petition to terminate the parental rights of appellee and E.C. to M.J.C., this status does not also necessarily provide them standing to seek custody of M.J.C. The reality of this case is that appellants are not seeking custody of M.J.C.; they want to adopt him. Appellants' actions evidence this fact.[6] Appellants are attempting to gain parental rights to M.J.C. while excluding his natural parents from contact with him by filing petitions to involuntarily terminate the natural parents' parental rights to M.J.C. Consequently, the provisions of the Adoption Act[7] must govern the disposition of this case. *See Commonwealth ex rel. Grimes v. Yack*, 289 Pa.Super. 495, 519–20, 433 A.2d 1363, 1376 (1981) (Adoption Act governs action by pre-adoptive parents who seek custody of infant by attempting to involuntarily terminate the parental rights of natural mother who revoked her consent to the adoption and natural father who never consented to the adoption).

Consent to adopt a child is required of the natural parents of a child who has yet to reach the age of eighteen. 23 Pa.C.S.A. § 2711(a)(3). This consent only remains valid if it is not revoked before the entrance of a decree terminating the natural parents' pa-

rental rights to a child or a decree of adoption. 23 Pa.C.S.A. § 2711(c); 23 Pa.C.S.A. § 2711(d)(1). A long line of Pennsylvania case law establishes that a natural parent's revocation of his or her consent to adopt can occur at any time prior to the entry of the final adoption decree unless a termination of parental rights has occurred. *Commonwealth ex rel. Grimes v. Yack, supra* at 521, 433 A.2d at 1377 (citations omitted). Only when an involuntary termination of a parent's parental rights to a child occurs will the consent of that parent not be required for a valid adoption to occur. 23 Pa.C.S.A. § 2714.

Neither of the natural parents of M.J.C. voluntarily terminated their parental rights to him.[8] Thus, it must be determined whether appellee's or E.C.'s parental rights to M.J.C. should be terminated involuntarily. The crux of this appeal rests upon the resolution of this involuntary termination of parental rights issue. If appellee or E.C. still possess parental rights to M.J.C., then appellants cannot contest appellee's custody of his child. This is the reason that appellants aver that appellee's and E.C.'s parental rights should be terminated under 23 Pa.C.S.A. § 2511(a)(6). Appellants argue that appellee's and E.C.'s lack of contact with M.J.C. during the six months following his birth requires this Court to terminate the parental rights of appellee and E.C. to M.J.C. despite appellee's lack of knowledge or proof that M.J.C. was his child for three months after M.J.C.'s birth and E.C.'s revocation of her consent to adopt.

■ Terminating the parental rights of the natural parent to his child carries with it a constitutional significance because of the importance of the rights involved. *In re J.W.*, 396 Pa.Super. 379, 388, 578 A.2d 952, 957 (1990). Consequently, clear and convincing evidence is necessary to prove the statutory grounds necessary to terminate parental

---

**6.** Besides attempting to involuntarily terminate the parental rights of M.J.C.'s natural parents, appellants relentlessly sought appellee's consent to their adoption of M.J.C. during the period immediately preceding and after M.J.C.'s birth. Moreover, appellants filed the report of intent to adopt M.J.C. on August 23, 1993. These actions, coupled with the legal steps appellants took after receiving appellee's December 8, 1993 letter,

clearly demonstrate appellants' intent to adopt M.J.C. and not merely gain custody of him.

**7.** 23 Pa.C.S.A. § 2101 *et seq.*

**8.** As already stated, appellee never consented to the adoption of M.J.C. and, on January 29, 1994, E.C. revoked the consent that she had given to the adoption of M.J.C.

rights. *Id. See In re Adoption of J.J.*, 511 Pa. 590, 593–94, 515 A.2d 883, 885–86 (1986) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). Clear and convincing evidence in this context, as explained by our Supreme Court, means the following:

> ... testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

*In re Christopher Stephan Atencio,* —— Pa. ——, 650 A.2d 1064, 1066 (1994); *In re J.W.,* supra at 388, 578 A.2d at 957 (quoting *Matter of Sylvester,* 521 Pa. 300, 304, 555 A.2d 1202, 1203–04 (1989)). Additionally, our inquiry, when reviewing the trial court's determination regarding the involuntary termination of parental rights is limited.

> When reviewing a decision whether to terminate involuntarily parental rights, our inquiry is limited to whether the decision of the court below was supported by competent evidence ... Absent an abuse of discretion, an error of law or insufficient evidentiary support for the chancellor's decision, the decree must stand.

*In re E.S.M.,* 424 Pa.Super. 296, 302, 622 A.2d 388, 391 (1993) (citations omitted). *See also In re Adoption of Christopher Stephan Atencio, supra.*

Instantly, we conclude that the trial court correctly denied appellants' petition to terminate appellee's parental rights to M.J.C. To terminate appellee's parental rights to M.J.C., appellants had to clearly and convincingly prove to the trial court the following: appellee knew or had reason to know of his child's birth, appellee did not live with M.J.C., appellee and E.C. were not married, and appellee failed to make reasonable efforts to maintain substantial and continuing contacts with his child and has failed to substantially support his child financially for the four months preceding appellants' filing of the termination petition. If appellants had proven the existence of all of these factors to the trial court by clear, direct, and weighty testimony, then the trial court could have terminated appellee's parental rights to M.J.C. But, appellants failed to satisfy this burden.

■■■ Although appellee knew that M.J.C. was born on August 13, 1993, the record clearly reveals that appellee did not know nor did he acknowledge that he was M.J.C.'s father until after he received the results of the paternity tests in early November 1993. Less than two months after M.J.C.'s birth, appellee made reasonable efforts, at his own expense, to determine whether M.J.C. was in fact his child. Appellee spoke with Mr. Totaro about M.J.C. approximately one month after M.J.C. was born. As a result of this conversation, appellee paid for all the paternity tests necessary to find out if he actually was M.J.C.'s father. These tests were completed before M.J.C. was a month and a half old.[9]

---

9. The legislative history of 23 Pa.C.S.A. § 2511(a)(6) clearly indicates that the General Assembly did not intend to deprive a natural father of his parental rights to his child when he does not, as in this case, know that he has a child. This legislative intent is best exemplified by the following exchange between Ms. Josephs and Mrs. Hagarty approximately six months prior to the passage of the May 22, 1992 amendments to the Adoption Act:

> Ms. JOSEPHS. I want to end this with a number of questions on the grounds for involuntary termination. I have been raising these problems and I want to put it in the form of questions because I am concerned about parents' rights to their biological children.
> Page 10, line 15, section 2511, subsection (6). Mr. Speaker, it seems to me we could have a hypothetical where a newborn child was born. The father may or may not know of the pregnancy. The father does not reside with the child because the mother does not wish that or the father is not available to be free in choosing his place of residence. He has not married the child's other parent because the child's other parent does not wish that. He has failed for a period of 4 months immediately preceding the filing of the petition to maintain substantial and continuing contact with the child, perhaps because he does not know there is a child or perhaps because the other parent does not allow him to do it or perhaps because he is in jail or in the military, and he has not managed to support that child within the 4 months preceding the filing of the petition because he does not have the money, because the other parent will not take the money, because he is in jail, because he is in the military.
> Do you not think it is unfair to deprive that father of rights to his natural child?
> Mrs. HAGARTY. Mr. Speaker, that father would not, under any circumstances, be de-

Subsequently, within a month of receiving the results of the paternity tests, appellee, in the letter dated December 8, 1993, stated that he would petition for custody of M.J.C. unless appellants consented to a visitation schedule which would allow appellee to have a relationship with his child. In response to this letter, appellants petitioned to involuntarily terminate appellee's parental rights to M.J.C. on December 13, 1993 without even notifying appellee or his attorney. Thus, 23 Pa.C.S.A. § 2511(a)(6) requires an examination of the four months prior to December 13, 1993. Specifically, we must determine whether appellee made reasonable efforts to maintain continuing and substantial contacts with M.J.C. during the four months between M.J.C.'s birth and the filing of appellants' petition to involuntarily terminate appellee's parental rights to M.J.C.

■ Appellee's first efforts to maintain continuing and substantial contacts with M.J.C. occurred in September 1993 when he began the process to determine his paternity of M.J.C. Appellee hired an attorney, Mr. Cunilio, to represent him and protect his parental rights to M.J.C. in case it was proven that M.J.C. was his child. Subsequently, appellee paid for all the necessary tests to determine the likelihood of his paternity of M.J.C. These tests were conducted on appellee and E.C. on September 20, 1993 and on M.J.C. on September 22, 1993. Finally, within one month of receiving the results of the paternity tests, appellee expressly stated, via the December 8, 1993 letter, that he wanted to establish a visitation schedule with M.J.C. or he would file for custody. Therefore, we hold that appellee's actions during the four months prior to the filing of appellants' petition to involuntarily terminate his parental rights to M.J.C. constituted reason-able efforts to maintain continuing and substantial contacts with M.J.C.

■ Moreover, actions taken by appellee between the appellants' filing of their petition to involuntarily terminate his parental rights to M.J.C. on December 13, 1993 until appellee received notice of this petition on or after January 31, 1994 can also be used to show that appellee made reasonable efforts to maintain continuing and substantial contacts with M.J.C. Notice that a petition to terminate a parent's parental rights to his child has been filed is not required until ten days before the termination hearing. 23 Pa. C.S.A. § 2503(b); 23 Pa.C.S.A. § 2513(b). When determining whether to terminate a parent's rights to his child under 23 Pa. C.S.A. § 2511(a)(6), the trial court cannot consider the parent's efforts to remedy the conditions described in the involuntary termination petition "which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). Impliedly, this means that a parent's efforts to assume his parental duties towards his child before receiving notice of the petition to involuntarily terminate his parental rights can be considered by the trial court when ruling upon the petition.

On December 14, 1993, December 27, 1993, and January 31, 1994, the trial court ordered that appellee be notified of the hearing regarding appellants' petition to involuntarily terminate his parental rights to M.J.C. But, the record reveals that appellee did not receive notice of appellants' petition to involuntarily terminate his parental rights to M.J.C. until January 31, 1994 at the earliest.

■ By letter dated January 28, 1994, appellee, through his newly retained counsel,

---

prived of rights to his natural child. This section makes it clear, number one, that the father must know or have reason to know of the birth of the child. Secondly, case law is abundantly clear that incarceration or other obstacles to parenting a child are clearly not grounds for termination. There are no circumstances as Ms. Josephs has described that would result in a termination of parental rights under this section.
Statements of Representatives Josephs and Hagarty, 1991 Pa. Legislative Journal—House at

1666. While these statements are not dispositive of legislative intent, we may properly consider them as an aid in ascertaining it. *Commonwealth v. Berryman*, —— Pa.Super. ——, ——, 649 A.2d 961, 971–72 (citing *Commonwealth v. Wilson*, 529 Pa. 268, 275 n. 4, 602 A.2d 1290, 1294 n. 4 (1992), *cert. denied* in *Aultman v. Pennsylvania*, —— U.S. ——, 112 S.Ct. 2952, 119 L.Ed.2d 574 (1992)). After all, ascertaining and effectuating legislative intent is the objective of all statutory construction. 1 Pa.C.S.A. § 1921(a); *Hodges v. Rodriguez*, 435 Pa.Super. 360, 368, 645 A.2d 1340, 1344–45 (1994) (citations omitted).

Mr. Applebaum, informed appellants and Mr. Totaro that he intended to seek custody of M.J.C. Thus, less than three months after learning of his paternity of M.J.C. and before being notified of the petition to involuntarily terminate his parental rights to M.J.C., appellee sought custody of his child. Therefore, we conclude that both the actions taken by appellee before being notified of the petition to involuntarily terminate his parental rights to M.J.C. and his actions before this petition was actually filed on December 13, 1993 unequivocally established that the trial court correctly denied appellants' petition to involuntarily terminate appellee's parental rights to M.J.C. The competent evidence in this case supported the trial court's findings that appellee's parental rights to M.J.C. should not be terminated involuntarily. Moreover, the trial court did not misapply the law or abuse its discretion by failing to involuntarily terminate appellee's parental rights to M.J.C.

The trial court's refusal to terminate the parental rights of E.C. was also proper. A hearing must be held to confirm the termination of the parental rights of a natural parent to her child. 23 Pa.C.S.A. § 2503(c); 23 Pa.C.S.A. § 2504(b). A natural mother who consents to the adoption of her child may revoke this consent at any time prior to entrance of a court decree confirming her consent or otherwise terminating her parental rights to her child if she serves a written statement of the revocation of her consent upon the adult to whom she relinquished her consent. 23 Pa.C.S.A. § 2711(c); 23 Pa. C.S.A. § 2711(d)(1). Appellants, however, assert that even though E.C. revoked her consent to the adoption of M.J.C., E.C.'s parental rights to M.J.C. are still subject to involuntary termination.

To consent to the adoption of her child, the natural parent must sign a document which includes the following relevant language:

I understand I may revoke this consent to permanently give up all rights to this child by placing the revocation in writing and serving it upon the agency or adult to whom the child was relinquished.

I understand I may not revoke this consent after a court has entered a decree confirming this consent or otherwise terminating my parental rights to this child. Even if a decree has not been entered terminating my parental rights I may not revoke this consent after a decree of adoption of this child is entered.

23 Pa.C.S.A. § 2711(d)(1). By mandating that a natural parent consenting to the adoption of her child sign a document which provides that she can revoke her consent at any time prior to a court decree confirming her consent or terminating her parental rights to her child, the General Assembly accorded great weight to the natural parent's ability to revoke her consent before the final determination in the adoption process. Significantly, the General Assembly placed no specific time limit upon the natural parent's ability to revoke her consent.

■ Instantly, E.C. revoked her consent before any hearings regarding the custody of M.J.C. occurred. On December 13, 1993, appellants petitioned to confirm E.C.'s consent to the adoption of M.J.C. Before receiving notice of this petition, by letter addressed to Mr. Totaro and dated January 29, 1994, E.C. revoked her consent to the adoption of M.J.C. This revocation occurred prior to any hearing concerning the confirmation of her original consent to the adoption of M.J.C. which would have terminated her parental rights to M.J.C. Therefore, we conclude that E.C.'s revocation complied with both the laws of this Commonwealth and the language stated in the consent to M.J.C.'s · adoption document she executed on August 16, 1993, and must be recognized.

■ Two days after E.C. exercised her specific right to revoke her consent to M.J.C.'s adoption, appellants petitioned to terminate E.C.'s parental rights to M.J.C. pursuant to 23 Pa.C.S.A. § 2511(a)(6). Consequently, we must examine, as we did with appellee, the four months prior to appellants' filing of this petition to determine whether the termination of E.C.'s parental rights to M.J.C. is merited. Once per month, after M.J.C. was adopted, appellee received letters from Mr. Totaro informing her of M.J.C.'s well-being. More importantly, however, is the fact that E.C. revoked her consent to M.J.C.'s adoption two days before appellants

filed their involuntary termination petition. By indicating that she wanted appellee to raise their child, E.C. made a reasonable effort to maintain continuing and substantial contact with M.J.C. At the hearing, E.C. testified that if M.J.C. were with appellee rather than appellants, she would still have some hope of forming a relationship with her child. *See* N.T. February 10, 1994 at 225. Therefore, the trial court did not abuse its discretion or misapply the law by refusing to involuntarily terminate E.C.'s parental rights because E.C. made reasonable efforts to maintain contact with M.J.C. during the four months prior to appellants' filing of the petition to involuntarily terminate her parental rights to M.J.C.

 Because appellants failed to successfully petition for the involuntary termination of appellee's and E.C.'s parental rights to M.J.C., the trial court denied appellants standing under the Adoption Act to challenge appellee's custody of M.J.C. For standing to exist, the party seeking relief must be aggrieved or adversely affected in some way. *In re Adoption of B.E.W.G.*, 355 Pa.Super. 554, 560, 513 A.2d 1061, 1064 (1986); *Mitch v. Children & Youth S.S. Agency, supra* at 46, 556 A.2d at 421. An immediate, direct, and substantial injury must be alleged for the aggrieved or adversely affected party to possess standing to challenge a matter via the judicial process. *In re Adoption of B.E.W.G., supra* at 560, 513 A.2d at 1064; *Mitch v. Children & Youth S.S. Agency, supra* at 46, 556 A.2d at 421. Thus, standing under the Adoption Act requires that the complaining party be aggrieved or adversely affected.

 Before a decree of adoption can be entered, a petition for adoption must be accepted by the court. 23 Pa.C.S.A. § 2902(a). All of the consents necessary to adopt a child must be attached to the adoption petition or the petition for adoption must set forth the basis upon which such consents are not required (*i.e.,* the involuntary termination of the parental rights of the natural parent or parents). 23 Pa.C.S.A. § 2701(7). Therefore, for the pre-adoptive parents to be aggrieved or adversely affected by the judicial process when they are attempting to adopt a child under the Adoption Act, the direct, immediate, and substantial injury they must set forth will not exist without their possession of all the consents necessary to complete the adoption petition or a valid basis for which these consents are not required. *See Commonwealth ex rel. Grimes v. Yack, supra* (no standing under the Adoption Act exists for pre-adoptive parents who seek to gain custody of infant when they fail in their attempt to involuntarily terminate the parental rights of the natural parents).

 Appellants are now ineligible to adopt M.J.C. because appellee never consented to M.J.C.'s adoption and E.C. properly revoked her consent. The fact that appellants, as they allege, stood *in loco parentis* to M.J.C. at one time is irrelevant for purposes of their standing to challenge appellee's custody of M.J.C. under the Adoption Act. Appellants' *in loco parentis* status *vis a vis* M.J.C. only allowed them to petition for the involuntary termination of appellee's and E.C.'s parental rights to M.J.C. Once this petition was denied and M.J.C. was delivered to appellee, appellants' *in loco parentis* status to M.J.C. ended, along with their ability to adopt him. The Adoption Act does not allow pre-adoptive parents to challenge the natural parents' ability to have custody of their child when the parental rights of the natural parents have not been terminated and the natural parent's consent to the adoption has not been given or has been properly revoked.[10] Resultantly, appellants are not

10. Appellants' reliance on *Mitch v. Children & Youth S.S. Agency, supra,* is misplaced. In that case, the appellants, the Deans, sought legal custody of the child they were attempting to adopt from the agency that had taken the child from their home. Although this Court emphasized the expectation of a permanent relationship between the appellants as pre-adoptive parents and the child, Joseph Mitch, we specifically held that pre-adoptive parents "suffer a direct and substantial injury when an agency removes a child from them...." *Mitch v. Children & Youth S.S. Agency, supra* at 50, 556 A.2d at 423. Thus, it was the fact that the agency, not the natural parents, gained physical and legal custody of the child that allowed the appellants to have standing to contest the child's adoption. Joseph Mitch's natural parents were in no way involved in deter-

aggrieved or adversely affected in any way by the trial court's award of custody of M.J.C. to appellee. Because appellants are ineligible to adopt M.J.C. and a decree of adoption could not be entered in appellants' favor, appellants suffer no immediate, direct, or substantial injury resulting from the trial court's custody award that is correctable by a judicial proceeding. They lack standing to challenge it.[11]

Based upon the foregoing analysis, we affirm the trial court's denial of appellants' petition to involuntarily terminate the parental rights of appellee and E.C. to M.J.C. and its award of custody of M.J.C. to appellee.[12]

Orders affirmed.

mining his custody. Moreover, the standing was specifically found to exist under the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.*, and not the Adoption Act. *Id.* at 52, 566 A.2d at 424. Appellants do not and cannot assert their standing based upon the Juvenile Act or any other act beside the Adoption Act.

11. We note that because appellants lack standing, no need exists to determine whether a hear-

ing is necessary to determine the best interests of M.J.C.

12. We note that T.J.B., in his brief, requests counsel fees for this appeal. But, because we do not believe that appellants' appeal was frivolous or their conduct was dilatory, obdurate, or vexatious, we decline to award counsel fees to T.J.B. *See* Pa.R.App.P. 2744.