**In re Adoption of Baby Girl "B"**

C.P. of Cumberland County, no. 97-0109 Adoptions.

*James D. Flower Jr.,* for petitioners.
*Anne M. Shepard,* for "E."
*Lindsay D. Baird,* for Baby Girl "B."

BAYLEY, *J.,* May 13, 1998—On July 16, 1997, "A" and "C" met with representatives of Adoption Placement Inc., in Fort Lauderdale, Florida. "A" was pregnant, and she and "C" said that he was the father. "A" said that her due date was August 10, 1997. "A" and "C" made arrangements with the agency to have the baby adopted. "A" gave birth to Baby Girl "B" in Florida on July 27, 1997. On July 29, 1997, "A" signed a consent surrendering the baby to Adoption Placement Inc. On August 2, 1997, the "Ds" of Shippensburg,

Pennsylvania, received Baby Girl "B" as the result of a placement by Adoption Placement Inc., working through Adoption Horizons in Shippensburg, Pennsylvania. On August 25, 1997, an order was entered in the Circuit Court of the Seventeenth Judicial Circuit of Broward County, Florida, terminating the parental rights of "A" and "C" to Baby Girl "B."

On November 17, 1997, "A" called Adoption Placement Inc. She stated that she wanted her baby back. She was with "E" who told the representative on the phone that he was the father of Baby Girl "B" and that he wanted the baby. "E" went to Adoption Placement Inc. on November 19, 1997. He again stated that he was the father of Baby Girl "B" and that he wanted the baby. The agency would not divulge the location of the baby to "E." However, it immediately notified the "Ds" of the parental claim made by "E."

On December 5, 1997, the "Ds" filed this petition for involuntary termination of the putative parental rights of "E." An order was entered on December 23, 1997, setting a hearing date on the petition for February 18, 1998. The petition and the order were served on "E" on January 22, 1998. On February 13, 1998, the "Ds" filed a petition in this court seeking to adopt Baby Girl "B." Hearings on the merits of the involuntary termination petition were conducted on February 18 and May 11, 1998.

"E," age 39, lives in an apartment in Tampa, Florida. He is single and unemployed. He draws military retirement and social security disability. He has a daughter in the Army, age 20, and daughters, ages 18 and 17, and a 15-year-old son, none of whom live with him. "E" testified that "A" moved into his apartment in Tampa on April 8, 1996. She brought her two children whose father is "C." "C" and "A" had maintained a long-term

relationship. "C" had left the State of Florida when "A" moved in with him. "E" recalls that "A" became pregnant in November 1996. During her pregnancy, "E" took "A" to a doctor for prenatal care. Her due date was in August 1997.

"E" testified that "A" left him on June 19, 1997, stating that she was returning to live with "C" in Louisiana. He testified that "A" left him after a Florida state agency removed her two children from their home and threatened not to return them after she had spanked one of the children. "E" testified that "A" told him that he would be able to see their child and that she would accept financial support from him. "E" also talked to "C" who told him that "I could see the kid and I had nothing to worry about, that he was going to raise the infant as his own, and they [were] going to move to Louisiana." "E" testified that "A" did not provide him an address or telephone number to contact her in Louisiana, and he did not know any of her relatives whom he could have contacted. Therefore, he was unable to contact "A" even though he knew their baby would be born around the beginning of August 1997.

"E" testified that on November 17, 1997, "A" contacted him and told him of the birth of "B" and that she had placed the child for adoption. It was on that day that they called Adoption Placement Inc. in Fort Lauderdale. He then went to the agency office on November 19, 1997, seeking to have his child given to him. An employee of Adoption Placement Inc., in Fort Lauderdale, and an owner/attorney of the agency, testified that when "E" came to the agency on November 19, 1997, he told them that he had contacted the mother to see the child, and to get a picture of the child, because he was moving to Georgia. When the agency would not divulge the location of the placement of Baby Girl

"B," "E" contacted an attorney in Florida on November 26, 1997. On December 2, 1997, through the attorney, "E" filed a vital statistics report in the State of Florida that listed him as the father of Baby Girl "B." "E" testified that he did not learn where his daughter had been placed until he was served on January 22, 1998, with the within petition and hearing notice for the involuntary termination of his putative parental rights. As part of this proceeding, blood tests were conducted. Based on the genetic testing results, the probability of the paternity of "E" to Baby Girl "B" is 99.99 percent.

## DISCUSSION

All parties agree that the law in Pennsylvania is applicable to this petition seeking to involuntarily terminate the parental rights of "E" to Baby Girl "B." The Adoption Act, 23 Pa.C.S. §2101 et seq. provides at section 2511(a)(6) that the rights of a natural parent to a child may be terminated on the grounds that:

"In the case of a newborn child, the parent knows or has reason to know of the child's birth, does not reside with the child, has not married the child's other parent, *has failed for a period of four months immediately preceding the filing of the petition to make reasonable efforts to maintain substantial and continuing contact with the child* and has failed during the same four-month period to provide substantial financial support for the child." (emphasis added)

Clear and convincing evidence is necessary to prove the statutory grounds to terminate parental rights. *In re Adoption of Atencio,* 539 Pa. 161, 650 A.2d 1064 (1994). In *Atencio,* the Supreme Court of Pennsylvania stated that clear and convincing evidence is "[t]estimony that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction,

without hesitance of the truth of precise facts in issue."
We find that "E" is the father of Baby Girl "B." The
time sequence in the case is:

| | |
|---|---|
| "A" starts to live with "E" | April 8, 1996 |
| "A" became pregnant | November 1996 |
| "A" left "E" | June 19, 1997 |
| Baby Girl "B" was born | July 27, 1997 |
| "A's" parental rights are terminated in Florida | August 25, 1997 |
| "A" told "E" of the birth and the placement of the child for adoption and they called Adoption Placement Inc. stating that they wanted Baby Girl "B" | November 17, 1997 |
| "E" went to Adoption Placement Inc. to claim Baby Girl "B" | November 19, 1997 |
| "E" contacted an attorney in Florida | November 26, 1997 |
| "E" filed a vital statistics form in Florida claiming he is the father of Baby Girl "B" | December 2, 1997 |
| The petition for involuntary termination of "E's" putative parental rights is filed in Pennsylvania | December 5, 1997 |
| "E" is served with petition and learns for the first time the location of Baby Girl "B" in Pennsylvania | January 22, 1998 |
| The first hearing is conducted on the petition for involuntary termination | February 18, 1998 |

Reviewing the prerequisites for the termination of parental rights under the Adoption Act at 23 Pa.C.S. §2511(a)(6), "E" (1) knew that his child would be born around the beginning of August 1997, (2) did not reside with his child, and (3) did not marry his child's mother, "A." As to the fourth requirement, the failure of a parent for a period of four months immediately preceding the filing of the petition for involuntary termination to make reasonable efforts to maintain substantial and continuing contact with the child, *that four-month period ran from August 6, 1997, to the date of the filing of the petition for involuntary termination on December 5, 1997.*

In *T.J.B. v. E.C.,* 438 Pa. Super. 529, 652 A.2d 936 (1995), M.J.C. was born on August 13, 1993. On August 16, the child was placed with the Totaros, the proposed adopting parents. The mother claimed that appellee was the father of the child. He refused to decide whether he would consent to an adoption until blood tests were taken. In early November 1993, the results of blood tests showed that appellee was the father of M.J.C. On December 8, appellee acknowledged paternity for the first time. He sought to meet M.J.C. and told the Totaros that he would not consent to an adoption unless he received some later access to M.J.C. On December 13, the Totaros filed a petition pursuant to the Adoption Act at 23 Pa.C.S. §2511(a)(6), to involuntarily terminate appellee's parental rights to M.J.C. The petition was not served on appellee until February 3, 1994. Following a hearing, the trial court denied the petition to involuntarily terminate appellee's parental rights from which the Totaros filed an appeal to the Superior Court of Pennsylvania.

The Superior Court noted that, "[O]nly when an involuntary termination of a parent's parental rights to a child occurs will the consent of that parent not be

required for a valid adoption to occur." *Id.* at 542, 652 A.2d at 943. The court concluded that the Totaros had not proven by clear and convincing evidence that the parental rights of appellee should have been terminated. It noted that the issue was whether appellee made reasonable efforts to maintain continuing and substantial contact with M.J.C. during the four months between M.J.C.'s birth and the filing of the petition to involuntarily terminate his parental rights. The court stated:

"Appellee's first efforts to maintain continuing and substantial contacts with M.J.C. occurred in September 1993 when he began the process to determine his paternity of M.J.C. Appellee hired an attorney, Mr. Cunilio, to represent him and protect his parental rights to M.J.C. in case it was proven that M.J.C. was his child. Subsequently, appellee paid for all the necessary tests to determine the likelihood of his paternity of M.J.C. These tests were conducted on appellee and E.C. on September 20, 1993 and on M.J.C. on September 22, 1993. Finally, within one month of receiving the results of the paternity tests, appellee expressly stated, via the December 8, 1993 letter, that he wanted to establish a visitation schedule with M.J.C. or he would file for custody. Therefore, *we hold that appellee's actions during the four months prior to the filing of appellants' petition to involuntarily terminate his parental rights to M.J.C. constituted reasonable efforts to maintain continuing and substantial contacts with M.J.C." Id.* at 546, 652 A.2d at 945. (emphasis added)

In the case sub judice, even though "E" knew that his child would be born around the beginning of August 1997, he made no immediate effort to contact his child. He had been told that the mother and "C" were living in Louisiana. Whether we accept his testimony that

he did not know where to contact them and that "A" finally contacted him, or if based on the testimony of what the owner/attorney and the employee of Adoption Placement Inc. said "E" told them on November 19, 1997, were we to conclude that he finally contacted "A," the fact remains that he made no effort to have any contact with his child until November 17, 1997. Either way, it was that day that the mother told him that she had placed her daughter with Adoption Placement Inc. It was the placement that "E" objected to, not the mother raising the child. Therefore, on November 17, which was the first time he learned of the placement, he sought to claim his child by calling the agency. He went to Adoption Placement Inc. two days later, on November 19, to seek contact and to press his claim as the father. However, he was denied any information as to where his child was located. He contacted an attorney on November 26. On December 2, he filed a vital statistics form in the State of Florida claiming that he was the child's father. He did not learn of the placement in Pennsylvania until he was served with the petition for involuntary termination on January 22, 1998. The first hearing on the petition was conducted less than a month later on February 18, 1998.

On these facts, as in *T.J.B. v. E.C., supra,* we find that "E," starting on November 17, 1997, which was within four months prior to the filing of this petition for involuntary termination on December 5, 1997, made reasonable efforts to maintain continuing and substantial contact with "B."[1] In our making this determination,

---

1. As to the fifth requirement to terminate parental rights under section 2511(a)(6), that a parent during the four-month period prior to the filing of the involuntary termination petition fails to provide substantial support for his child, there was no way "E" could provide such support because he was not told where "B" had been placed.

counsel for the "Ds" and Baby Girl "B" argue that we should consider section 2511(b) of the Adoption Act that provides, "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." This provision has been interpreted to mean that once it has been determined that the statutory requirements for the involuntary termination of parental rights exist, then the court must be further satisfied before ordering termination that it will serve the needs and welfare of the child. *In re E.S.M.,* 424 Pa. Super. 296, 622 A.2d 388 (1993). In the present case, no statutory requirements for the termination of "E's" parental rights to Baby Girl "B" have been met. Therefore, section 2511(b) does not apply.

In conclusion, there is no clear and convincing evidence that the prerequisite for terminating "E's" parental rights under section 2511(a)(6) of the Adoption Act has been met. Therefore, the following decree is entered.

## DECREE NISI

And now, May 13, 1998:

(1) The petition to involuntarily terminate the parental rights of "E" to Baby Girl "B," born July 27, 1997, is denied.

(2) This decree nisi shall be governed by Pennsylvania Rule of Civil Procedure 227.1.

---

Obviously, both "E" and the "Ds" were the victims of the mother's duplicity that led to these circumstances.