**In re ADOPTION OF M.R.B.**

**Appeal of Bethany Christian Services, Appellant.**

Superior Court of Pennsylvania.

Argued May 17, 2011.
Filed July 27, 2011.

1248

Michael P. Robic, II, Pittsburgh, for appellant.

Clara J. Montanari, Beaver, for S.G., participating party.

BEFORE: MUSMANNO, BOWES, and FITZGERALD *, JJ.

OPINION BY BOWES, J.:

Bethany Christian Services ("BCS"), a licensed child placement agency, appeals from the orphans' court's decree denying its petition to terminate the parental rights of S.G. ("Father") to his minor son, M.R.B., pursuant to 23 Pa.C.S.

§ 2511(a)(6) and (b). We reverse and remand for further proceedings.

M.R.B. was conceived during late Summer 2009, while Father and R.B. ("Mother"), who were then legally separated from their respective spouses, resided together in Enon Valley, Pennsylvania. N.T., 12/7/10, at 35–36, 61. The couple had maintained an exclusive relationship since February 2009. *Id.* at 36. Father attended an ultrasound examination during September 2009, wherein the couple learned that their child was expected to be born on April 28, 2010. *Id.* at 18, 36. Mother and Father's brief relationship dissolved approximately two months later. *Id.* at 37. Mother left their residence during November 2009. *Id.* A few weeks later, she secured a final protection from abuse ("PFA") order against Father. *Id.* at 18–19, 39. Mother's PFA petition alleged that after she objected to Father's use of corporal punishment to reprimand her one-and-one-half-year-old son by a previous relationship, Father hurled a chair at the child. *Id.* at 38. Although the chair missed her son, it shattered the glass on the oven door and sent pieces of glass cascading over the toddler. *Id.* Thereafter, Father allegedly assaulted Mother physically. Following the incident, Father contacted Mother on the telephone and made a thinly-veiled threat to shoot her. *Id.* at 39. "He was saying that he had a gun, and that he was going to bring drama to [Mother's] house. . . . He . . . then threatened that he was going to kill himself." *Id.* The final PFA order expires on December 10, 2011.

Meanwhile, on January 27, 2010, Father pled guilty to harassment, a summary offense, stemming from his violent behavior during the break-up. *Id.* at 19, 64. The trial court imposed a $250 fine. The sentencing order included a "no contact" di-

* Former Justice specially assigned to the Superior Court.

rective that precluded Father from contacting Mother, directed Father to comply with the existing PFA order, and ordered him to undergo anger management. *Id.* at 29, 64–65; Respondent's Exhibit C.

M.R.B. was born on April 20, 2010. N.T., 12/7/10, at 7, 35. Prior to her son's birth, Mother contacted BCS regarding his adoption. *Id.* at 7, 40. Mother then contacted Father's attorney in order to schedule a meeting with Father to discuss their son's future. *Id.* at 41. Father refused to meet with Mother, noted his objection to the proposed adoption, and indicated his intention to sue Mother for physical custody of his son. *Id.* at 41. BCS subsequently contacted Father to ensure that he did not contest paternity and to determine whether he had notice of his son's due date. *Id.* at 10, 12. Father confirmed that he knew the due date and reiterated his position that he intended to pursue custody of the child. *Id.* at 10, 12. The agency advised Father that it did not get involved in custody matters. *Id.* at 10. Thereafter, Mother closed the adoption file with BCS and decided to raise M.R.B. alone and prepare for the impending custody dispute with Father. *Id.* at 12, 42. Although BCS previously advised Father that it would contact him when M.R.B. was born, since Mother had elected to close the case file and await the threatened custody litigation, the agency was no longer administering an open adoption case when M.R.B. was born. *Id.* at 13.

Following M.R.B.'s birth, Mother maintained legal and physical custody of her son until August 27, 2010, when more than four months after M.R.B.'s birth, she requested that BCS reopen her file and place M.R.B. for adoption. *Id.* at 14, 42–43.

Mother had been advised by the prospective parents' counsel that under the pertinent section of the Adoption Act, grounds existed to involuntarily terminate Father's parental rights because Father failed to contact his son, provide any financial support, or initiate custody proceedings against Mother for more than four months following M.R.B.'s birth. *Id.* at 42. The agency reopened the adoption file and immediately placed the infant with his prospective family. *Id.* at 14. Although Father knew of his son's due date, neither he nor his attorney contacted Mother about obtaining custody or visitation with the infant or otherwise maintaining substantial and continuing contact with him. *Id.* at 15–16, 42–44. Indeed, as of the evidentiary hearing on this matter, Father still had not contacted his son or provided any financial support. *Id.* at 15–16, 42–44.

On September 16, 2010, BCS filed a petition to involuntarily terminate Father's parental rights pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(6) and (b). Counsel was appointed, and on December 7, 2010, the orphans' court held an evidentiary hearing to address the merits of BCS's petition. Following the hearing, the orphans' court entered an order on December 30, 2010, wherein it denied BCS's petition to terminate Father's parental rights. As the orphans' court concluded that BCS failed to prove the statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(6), the court was not required to engage in the concomitant needs-and-welfare-analysis under 2511(b). BCS filed a timely appeal and a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).[1]

---

1. Although BCS initially failed to comply with Pa.R.A.P. 1925(a)(2)(i), which directs appellants to attach a concise statement of errors complained of on appeal to the notice of appeal in children's fast track cases, the agency filed a timely amended notice of appeal on January 18, 2011 that conformed with the rule.

BCS presents the following questions for our review:

I. Did the trial court [err] in [denying] Appellant's petition to involuntarily terminate parental rights filed under 23 Pa.C.S.A. § 2511(a)(6) ... when the trial court required Appellant to prove the birth father's "purpose and intent" to forego his parental rights?

II. Did the trial court abuse its discretion when it held that Appellant did not prove all elements of 23 Pa.C.S.A. § 2511(a)(6) and refused to terminate the birth father's parental rights?

Appellant's brief at 2.

██ Our standard of review regarding orders terminating parental rights is as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa.Super.2005). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *Id.* at 806.

██ The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super.2003). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73–74 (Pa.Super.2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super.2003).

In the case at bar, BCS argues that the orphans' court erred in failing to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(6) and (b), which state:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(6) In the case of a newborn child, the parent knows or has reason to know of the child's birth, does not reside with the child, has not married the child's other parent, has failed for a period of four months immediately preceding the filing of the petition to make reasonable efforts to maintain substantial and continuing contact with the child and has failed during the same four-month period to provide substantial financial support for the child.

. . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical

care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(6), and (b).

To satisfy the requirements of section 2511(a)(6), BCS was required to demonstrate by clear and convincing evidence that (1) M.R.B. is a newborn child; (2) Father knew or had reason to know of M.R.B.'s birth; (3) Father does not reside with M.R.B.; (4) Father has not married Mother; and (5) for a period of four months prior to the filing of the petition, Father has failed to make reasonable efforts to maintain substantial and continuing contact with M.R.B. and to provide substantial financial support. *See In re C.M.S.*, 832 A.2d 457, 465 (Pa.Super.2003). The only aspects of the statute in dispute in this case are whether Father had reason to know of his son's birth and whether Father made reasonable efforts to maintain substantial and continuing contact with him and to provide substantial financial support during the four-month period immediately preceding the filing of the petition.

▮ Upon review of the pertinent portions of the Adoption Act, we conclude that the orphans' court misapplied § 2511(a)(6) under the facts of this case. Herein, clear and convincing evidence established that within the four-month window that the Adoption Act directs the orphans' court to review pursuant to § 2511(a)(6), Father failed to make reasonable efforts to contact M.R.B. or to provide him financial support. Indeed, Father did nothing within the applicable period.

With regard to the substantive analysis of section 2511(a)(6), the orphans' court reasoned that BCS failed to prove by clear and convincing evidence sufficient grounds to terminate Father's parental rights. The orphans' court conceded that Father was aware that Mother was pregnant with his child and since he received notice of the due date he had reason to know of the expected birth. The orphans' court also observed that Father failed to contact his son or provide any financial support to him during the four-month period preceding the petition. Nonetheless, by focusing upon Mother's and BCS's actions during the pre-adoptive process and discounting Father's pronounced inaction, the orphans' court concluded that the agency could not prevail on its petition to involuntarily terminate Father's parental rights because it did not proffer clear and convincing evidence of Father's "purpose and intent." *See* Trial Court Opinion at 6–7. Specifically, the trial court reasoned,

> Admittedly, five (5) months and eighteen (18) days had elapsed since [M.R.B.'s] birth on April 20, 2010, and, because [Father] was advised of the projected due date, (*i.e.* April 28, 2010), he "had reason to know" his son was born sometime before October 8, 2010 [the date BCS filed the underlying petition]. However, before this or any court undertakes such an important consideration as the involuntary termination of parental rights of any parent, "clear and convincing" evidence of the parent's **purpose and intent** is required. That evidence, i.e., "clear and convincing", does not exist in the case under consideration. What is "clear" is that [Mother] did not have even one contact with [Father] after the child was born, her only contact with [Father's] P.F.A. attorney resulted in her being informed that [Father] would contest termination of his parental rights and would seek custody. It is also "clear" that, in addi-

tion to not being informed of the the birth of his child, [Father] was not advised of the whereabouts of his child or [Mother], thereby impeding his ability to protect his parental rights. Next, [Father] was faced with the choice of violating two (2) [c]ourt [o]rders and facing potential [c]ontempt of [c]ourt proceedings or relying on the word of the pregnancy counselor that she would advise him of the birth of his child. Instead of that message, he was served with a notice of a hearing to involuntarily terminate his parental rights.

While the evidence presented leads the Court to conclude that [Father] was not assertive in protecting his parental rights, [BCS] has failed to meet its burden of proving grounds for termination by "clear and convincing evidence[.]" Parental rights are far too important to be interfered with by the State or by Court Order upon such weak evidence. **Furthermore, parental rights cannot and should not be irretrievably terminated when four (4) months and twenty-seven (27) days lapse between the birth of the child and filing of the [p]etition to [t]erminate [parental] [r]ights,** most especially in light of the failure to prove when [Father] knew or had reason to know of the child's birth.

Trial Court Opinion, 12/30/10, at 6–7 (emphases added).

While the orphans' court failed to elucidate the specific purpose and intent that it believed the agency was required to establish, to the extent that the orphans' court required BCS to adduce clear and convincing evidence of Father's purpose and intent to forgo his parental rights, the orphans' court committed reversible error. As noted *supra*, the five statutory prongs required to establish the grounds for involuntary termination of parental rights pursuant to § 2511(a)(6) are clear and un-

equivocal. The test does not require the moving party to establish a parent's purpose or intent. By invoking these considerations in the case *sub judice*, the orphans' court conflated aspects of § 2511(a)(6), which applies specifically to parental rights over newborn children, with § 2511(a)(1), which applies to all children generally. Unlike the statutory grounds for terminating parental rights pursuant to § 2511(a)(6), subsection (a)(1) requires the moving party to demonstrate that the parent has evidenced a settled purpose of relinquishing his or her parental claim to the child. *See* 23 Pa.C.S. § 2511(a)(1). As the general assembly declined to include a similar requirement in delineating the grounds for termination outlined in § 2511(a)(6), the orphans' court erred in grafting the purpose and intent elements into that subsection in the case at bar. *See Fletcher v. Pennsylvania Property and Casualty Insurance Guaranty Association*, 603 Pa. 452, 985 A.2d 678, 684 (2009) ("where the legislature includes specific language in one section of the statute and excludes it from another, the language should not be implied where excluded").

■ In addition, we observe that to the extent the orphans' court considered the relatively short period between M.R.B.'s birth and the date BCS filed the petition to terminate Father's parental rights under § 2511(a)(6) as a factor that militates against termination, the orphans' court misapplied the statutory framework. The orphans' court intimates that the adoption agency should have waited longer than approximately five months from the child's birth before filing its petition for termination. However, this position conflicts with both the § 2511(a)(6)'s express application to newborn children, which the Adoption Act defines as less than six months old at the time the petition is filed, *see* 23 Pa.C.S. § 2102, and the four-month

review window that the legislature specifically set forth in the subsection to examine the parent's conduct. Under the prevailing statutory framework, a moving party has only two months within which it is permitted to file a petition seeking to terminate parental rights pursuant to § 2511(a)(6). Accordingly, the orphans' court misapplied § 2511(a)(6) by concluding that parental rights should not be involuntarily terminated only five months after a child's birth. If BCS had delayed filing the petition until what the orphans' court deemed a suitable time, the agency would have been precluded from invoking § 2511(a)(6) because M.R.B. would no longer satisfy the statutory definition of a newborn child.

Thus, in addition to the synthetic "purpose and intent" elements that the orphans' court grafted into the statutory grounds for termination pursuant to § 2511(a)(6), its interpretation of § 2511(a)(6)'s time requirements created a second artificial burden for the adoption agency to circumvent that our legislature neither contemplated nor authorized. Both of these mistakes constitute reversible error.

■ Moreover, our review of the record does not support the orphans' court's finding that BCS failed to satisfy its burden of proving by clear and convincing evidence the statutory grounds for involuntary termination of Father's parental rights pursuant to § 2511(a)(6). During the evidentiary hearing, Father testified that he knew of Mother's pregnancy, attended the ultrasound examination, and was aware that the baby was due between April 26 and 28, 2010. N.T., 12/7/10, at 18, 22. Likewise, he conceded that a representative from BCS contacted him prior to M.R.B.'s birth during April 2010 to inform him that Mother was considering an adoption plan for their child. *Id.* at 19–20.

Father stated that the BCS case worker also informed him that Mother was interested in meeting with him to discuss why Mother believed that adoption was the best course of action. *Id.* at 68. Prior to being contacted by BCS, Father had no idea that Mother considered placing M.R.B. for adoption. *Id.* at 67. During the telephone conversation, the representative advised Father that the adoption agency would contact him after the baby was born to disclose the particulars of his son's birth. *Id.* at 68. Father explained, however, that the agency never contacted him. *Id.* at 69. He eventually left a telephone message with the agency during early May 2010. *Id.* Even though BCS failed to contact Father after the birth, Father did not consider contacting Mother either directly or indirectly for fear of violating the PFA. *Id.*

Father rejected the offer to meet with Mother and BCS, in part, because his counsel, Bob Banks, Esquire, advised him to wait until his son was born and then contest paternity. *Id.* at 72. However, Father confirmed during the evidentiary hearing that he never filed a petition to contest paternity after M.R.B. was born and that paternity was not an issue in this case. *Id.* at 60, 73.

Mother and BCS also reached out to Attorney Banks to schedule a meeting with Father and discuss the prospective adoption. *Id.* at 20–21. Father claimed that he refused to discuss the matter with Mother because he could not afford to pay Attorney Bank's $2,500 fee to litigate an entire custody dispute. *Id.* at 21, 70. Father did not elucidate how that fee request related to his decision to decline BCS's invitation to meet with it; instead, he concluded, that since he vehemently objected to the adoption, there was no point in meeting with the agency. *Id.* at 22. Accordingly, Father advised BCS that he

would not agree to the adoption and that the agency would hear from his attorney. *Id.* at 23. However, Father never retained Attorney Banks or any other legal representation in order to fulfill his threat of suing Mother for custody of his son. *Id.* at 23, 70. Similarly, he declined to initiate the custody litigation *pro se*. *Id.* at 27. He also declined to contact an attorney through the Beaver County Bar Association referral service because it would cost $350 to pursue a custody hearing. *Id.* at 27. During the hearing, Father invoked his unemployment and his responsibility to his other son, who has health problems, as financial limitations on his ability to retain an attorney to pursue custody of M.R.B. *Id.* at 23, 58.

Likewise, Father invoked the PFA and the no-contact directive in the sentencing order to deflect his failure to make reasonable efforts to maintain substantial and continuing contact with M.R.B. and to provide substantial financial support. *Id.* at 19–20, 24, 27–29, 62–65. Father confirmed that although Mother's location and telephone number were unknown to him, he would have declined to contact her for fear of violating the PFA and no-contact directives. *Id.* at 65–66. Father claimed he did not attempt to circumvent these restrictions by contacting Mother's attorney because he was not aware that Mother was represented, even though he knew she was represented during the PFA proceedings. *Id.* at 24–25. Indeed, Father not only knew Mother's PFA attorney, he strongly objected to Mother's choice of legal representation because that attorney had previously represented Father's ex-wife during his divorce and concomitant custody dispute. *Id.* at 26.

Moreover, unlike his heightened concern over the no-contact order that the sentencing court imposed in the judgment of sentence for harassment, Father conceded during the evidentiary hearing that he still has not complied with the sentencing court's related directive to attend anger management. *Id.* at 65. In light of Father's apparent preoccupation with abiding by the no-contact order in this case, it is not clear why Father essentially ignored the sentencing court's latter directive. Violation of either of the sentencing court's dictates would have resulted in a finding of contempt.

Father continued that he was not aware that Mother had changed her mind and decided to maintain custody of M.R.B. after his birth or that BCS subsequently placed his son with his prospective family. *Id.* at 28, 66. Instead, he apparently believed that BCS had placed the baby in foster care. *Id.* at 66. Nevertheless, Father failed to send his son any financial support in care of the agency. *Id.* at 70. In fact, in complete contrast to his supposed believe that M.R.B. was in BCS's foster care, he subsequently testified, "I had no idea where to send [financial support], and I mean. To send it to [BCS] ... wasn't something that I thought ... would happen." *Id.* at 70. As of the date of the hearing, Father still had not provided any financial support for M.R.B. or even offered to help support his son. *Id.* at 29. Similarly, he has not filed for custody, sought visitation, or attempted to contact his son. *Id.* at 29–30.

The BCS pregnancy counselor, Amber Nehnevajsa Raine, testified that after learning that Mother identified Father as M.R.B.'s birth parent, the agency utilized a private investigator to locate him. *Id.* at 6–8. Eventually, on April 9, 2010, Ms. Raine established contact with Father through his brother, who forwarded the agency's contact information to Father. *Id.* at 8. Ms. Raine indicated that Father responded to the proposed adoption negatively. *Id.* at 9, 16, 75. Ms. Raine also

recommended that she and Father meet separately to explain the adoption process and to discuss his options. *Id.* at 75–76. Father responded to Ms. Raine's offer by calling her "crazy." *Id.* at 75–76.

Father informed Ms. Raine that he intended to seek custody of his son. *Id.* at 12. In response, she advised him that the adoption agency did not get involved in custody matters and that Father should seek counsel if he intended to pursue his custody rights. *Id.* at 10. Father indicated that he would retain Attorney Banks, his family attorney, in order to seek custody over the child. *Id.* In addition to the two telephone conversations with Father, Ms. Raine discussed the non-confidential aspects of this case with Father's mother, who reiterated that Father had contacted Attorney Banks and that BCS should expect communication from Attorney Banks's office. *Id.* at 11, 17, 75. Counsel never contacted the agency. *Id.* at 75.

Ms. Raine relayed Father's position to Mother, and Mother requested that the agency terminate the adoption so that she could raise the child alone. *Id.* at 12. However, more than four months after M.R.B. was born, and without having received any contact from Father, his family, or Attorney Banks, Mother directed BCS to reopen the adoption file. *Id.* at 14–15.

Ms. Raine also explained that although she originally advised Father that she would contact him after M.R.B. was born, once Mother decided to close the adoption file, Ms. Raine did not believe it was appropriate for the adoption agency to get embroiled in the custody dispute. *Id.* at 13, 14. She continued that after Father

contacted her during May 5, 2010, to inquire about his son's birth, she attempted to return Father's telephone call only after first receiving permission from the adoption agency's supervisor. *Id.* at 13–14. Unfortunately for Father, however, Ms. Raine was not able to reach him because his telephone service had been disconnected.[2] *Id.* at 14, 17. As it relates to Father's efforts to maintain substantial and continuing contact with M.R.B., Ms. Raine testified that she had no knowledge that Father made any attempts to contact his son or provide financial support since M.R.B. was placed for adoption. *Id.* at 15–16.

Mother's testimony relating to Father's threat to pursue custody of M.R.B. and his non-action during the relevant period was consistent with Ms. Raines. Mother confirmed that Father did not attempt to communicate with her during the pregnancy, either personally or through his attorney, and he failed to maintain contact with M.R.B. or provide any financial support after his birth. *Id.* at 36, 43–44. In contrast to Father's description of the factual scenario, Mother did not portray the PFA as an insurmountable obstacle to communication. In fact, she explained that she had previously cooperated with Father's mother despite the PFA in order to retrieve her personal items from Father's Enon Valley home, including an automobile that Mother subsequently discovered had been shot in the engine while parked at Father's residence. *Id.* at 39–40. Mother contacted Attorney Banks during the pregnancy to make similar arrangements to contact Father, inform him of the proposed adoption plan, and request that he terminate his

2. Father disputed Ms. Raine's characterization of the status of his telephone service. He asserted that if his telephone service had been disconnected, he would still have been permitted to access his voicemail messages. *Id.* at 33–34. Nevertheless, the status of Father's telephone service is not central to our discussion because BCS adduced clear and convincing evidence that Father was aware of Mother's April 28, 2010 due date and therefore had reason to know that the child would have been born near that date.

parental rights voluntarily. *Id.* at 41, 45. During those conversations with Attorney Banks, Mother confirmed M.R.B.'s due date. *Id.* at 41. In turn, Attorney Banks advised her that Father refused to meet with her and that Father intended to pursue custody of his son. *Id.*

Mother continued that following her conversation with Attorney Banks, she decided to forgo the adoption proceedings. *Id.* at 41–42. Thus, she directed BCS to close the adoption case. *Id.* at 42. Mother brought M.R.B. home from the hospital and raised her son for the next four months without any assistance from Father or his family. *Id.* at 42. Thereafter, having not heard from Father, either directly or indirectly, for more than four months, Mother reconsidered her decision to forgo adoption and concluded that placing her son for adoption with his prospective family was in his best interest. *Id.* at 42–43. She explained her decision as follows: "I love [M.R.B.] very much, and if I could give him the security and stability, then I would, but I can't and ... I think he is best ... served with the adoptive family." *Id.* at 43. Accordingly, she signed a consent to adoption, which she intends to confirm upon the termination of Father's parental rights, in order to proceed with the adoption. *Id.* at 44.

The record does not support the orphans' court's conclusion that BCS failed to sustain its burden of proving by clear and convincing evidence the statutory grounds to involuntarily terminate Father's parental rights pursuant to § 2511(a)(6). In focusing upon the impediments created by the PFA, no-contact directive, and Ms. Raine's hesitance to inform Father of M.R.B.'s birth rather than examining Father's utter failure to act during the pertinent four-month period, the trial court ignored all of the relevant considerations outlined in § 2511(a)(6) and supplanted that analysis with its apparent sympathy for Father's situation and its dissatisfaction with the adoption agency. The certified record reveals, however, that Father's predicament was not unmanageable. Father could have asserted his parental rights through Attorney Banks, forwarded money to M.R.B. in care of BCS, or attempted to have his mother establish contact with M.R.B. on his behalf. Father did not take any of these simple steps. Instead, Father did nothing.

We confronted a similar scenario in *In re C.M.S., supra* at 464, and concluded that the father failed to exercise "reasonable firmness" in attempting to overcome obstacles that his daughter's mother had deliberately erected to prevent him from exercising his parental rights. Accordingly, we rejected the trial court's reasoning that the mother's behavior excused the father's failure to maintain contact with his daughter during the pertinent periods or his failure to execute his parental duties, and we reversed the trial court's order denying the petition to terminate the father's parental rights pursuant to § 2511(a)(1) and (6).[3]

In *In re C.M.S.*, the birth mother and Carol Starr, the intermediary between the

---

**3.** Although the relevant discussion appears in the portion of the opinion addressing the statutory grounds for terminating Father's parental rights outlined in subsection (a)(1), we adopted that reasoning in reaching our conclusion that the mother also sustained her burden of proving the statutory grounds for terminating the father's parental rights pursuant to subsection (a)(6). Specifically, after addressing the father's meager attempts to overcome the obstacles mother placed in his path, we stated, "as previously discussed, [Father] had not made reasonable efforts to maintain substantial and continuing contact with Child or provide financial support for Child." *In re C.M.S.*, 832 A.2d 457, 466 (Pa.Super.2003). Accordingly, our discussion of the father's failure to employ "reasonable firmness" in that case is instructive to our review in the case at bar.

mother and the prospective adoptive parents, denied information to the father, lied about the progress of the pending adoption, and refused to disclose his daughter's whereabouts with the prospective parents. The father did not respond to mother's deceit by asserting his parental rights in any meaningful manner. He simply noted his opposition to the proposed adoption and then failed to pursue any legal action to establish contact with his daughter, seek physical custody, or obtain visitation rights. *Id.* at 464–465. Likewise, he waited for fourteen months without contacting his child until he was served with notice of the proposed adoption. *Id.* at 464. As it relates to the father's failure to maintain contact with his child or provide financial support during the pertinent period, we found that the father's actions were unreasonable. We stated, "A parent cannot protect his parental rights by merely stating that he does not wish to have his parental rights terminated. Father has not shown 'reasonable firmness' in overcoming the obstacles placed in his path by Mother and Ms. Starr." *Id.* at 464 (internal citation omitted).

Like the father in *In re C.M.S.*, Father's idleness in the case *sub judice* precludes him from relying upon the impediments posed by the PFA and the no-contact order, and BCS's reluctance to become intertwined in the threatened but uninitiated custody litigation. Mindful of the facts underlying this case, we conclude that Father's failure to take any meaningful action to navigate the obstacles in his path falls radically short of employing the reasonable firmness that we envisioned in *In re C.M.S.* Hence, the trial court erred in finding that BCS failed to demonstrate that Father did not establish substantial and continuing contact with M.R.B. or provide his son substantial financial support.

Had Father diligently sought to overcome the obstacles placed in his way or attempted to exercise his parental rights by maintaining contact with M.R.B. or providing his son financial support, then the statutory grounds would not exist to terminate his parental rights pursuant to § 2511(a)(6). However, the certified record confirms that Father failed to take any parental measures whatsoever during the relevant period and the only action that could arguably be viewed as evidence in his favor, *i.e.*, attempting one unsuccessful telephone call to BCS for information regarding Mother's pregnancy, occurred more than four months before BCS filed the underlying petition. Thus, that attempt lies outside of the pertinent review period.

It is beyond cavil that Father has not met M.R.B., nor has he taken any significant steps to develop a relationship with him. The evidence in the certified record confirms that Father was aware of M.R.B.'s birth, did not reside with the child, had not married Mother, and, as previously discussed, had not made reasonable efforts to maintain substantial and continuing contact with M.R.B. or provide him financial support. Accordingly, we find that the orphans' court abused its discretion in finding that BCS failed to satisfy the statutory requirements of section 2511(a)(6).

Father's related argument that the four-month window did not commence until he accepted paternity of M.R.B. is equally untenable. Father contends that pursuant to our rationale in *T.J.B. v. E.C.*,[4] 438 Pa.Super. 529, 652 A.2d 936 (1995), the four-month statutory window did not begin to run in this case until he accepted paternity during the December 7, 2010 hearing. Father's reliance on *T.J.B.* is wholly misplaced. That case does not stand for the proffered proposition, and it does not ad-

4. Father refers to the case inaccurately as *In re Adoption of M.J.C.*

dress whether a birth father's decision to deny paternity tolls the four-month window under § 2511(a)(6). In reality, we held that the birth father's efforts **during** the relevant statutory four-month window immediately preceding the prospective parents' petition to terminate his parental rights demonstrated his efforts to maintain continuing and substantial contact with his child. *Id.* at 945–946. Specifically, the father in *T.J.B.* denied paternity at the outset, retained an attorney to dispute paternity, paid for the required tests, and subsequently filed a petition for custody once paternity was confirmed. *Id.* at 940–941, 945.

In contrast to the father's actions taken in *T.J.B.*, Father did absolutely nothing during the relevant period in the case at bar. As BCS accurately observes, Father did not contest paternity in this case when he was first informed of Mother's pregnancy and, although he may have discussed challenging paternity with Attorney Banks, his only request to confirm paternity occurred beyond the four-month window and after he received notice of BCS's petition to involuntarily terminate his parental rights. Appellant's reply brief at 6–7. *See* 23 Pa.C.S. § 2511(a)(6), and (b) (as it relates to subsection (a)(6), relevant period is four-month window immediately preceding filing of petition and "the court shall not

consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."). Thus, notwithstanding Father's protestations to the contrary, *T.J.B.* is inapposite.

Moreover, the *T.J.B.* Court did not impose a requirement on the moving party to demonstrate that a father accepted paternity.[5] Instead, in affirming the orphans' court's decision to deny the petition in that case, we noted that the evidence supported the court's finding that the father sought to maintain ongoing contact with his son. Therein, the father contested paternity at the outset and obtained a paternity test at his own expense within one month and one-half after his son's birth because he had a legitimate concern that he was not the child's father. *T.J.B., supra* at 944. Although we approved of the father's decision to confirm paternity under the facts of that case prior to establishing contact with his son or initiating custody litigation, we did not hold, much less suggest, that petitioning parties are required to demonstrate paternity prior to filing a petition to terminate a father's parental rights.

The case at bar can also be distinguished from *T.J.B.* based on the fact that unlike the factual scenario underlying *T.J.B.*, there was no legitimate question of paternity herein. Father shared an exclu-

---

5. Father's reliance upon our discussion at footnote nine in *T.J.B. v. E.C.*, 438 Pa.Super. 529, 652 A.2d 936, 944 (1995), concerning the General Assembly's presumed legislative intent, is unpersuasive. In the footnote, this Court referred to an exchange between two State Representatives prior to passing the pertinent provision, and noted, "The legislative history of 23 Pa.C.S.A. § 2511(a)(6) clearly indicates that the General Assembly did not intend to deprive a natural father of his parental rights to his child when he does not, as in this case, know that he has a child." The relied-upon exchange however, merely highlighted that a father's rights would not be terminated unless he knew or had reason to

know of the child's birth. The passage did not mention paternity testing or suggest that the statutory grounds for terminating parental rights included an additional, implicit element regarding paternity. Herein, we expressly reject the suggestion that a paternity test is required in every case brought pursuant to 2511(a)(6) to establish that a father had notice of his child's birth. *See In re Z.S.W.*, 946 A.2d 726, 731 (Pa.Super.2008) (permitting fathers to defer their parental obligations pending confirmation of paternity "would relieve all fathers of their parental duties until their parentage was confirmed by a paternity test.").

sive relationship with Mother when their son was conceived and he attended the ultrasound examination during the pregnancy. Father did not even raise the issue of paternity tangentially with his attorney until after Mother moved from his residence, secured a PFA, and advised him of her intention to place M.R.B. for adoption. While Father apparently considered contesting paternity as a legal maneuver in response to the proposed adoption, he did not arrange a paternity test at his own expense and he ultimately failed to contest paternity during the relevant period. Thus, his reliance upon *T.J.B.* for the proposed proposition is unpersuasive.

For all of the foregoing reasons, we conclude that the orphans' court erred in failing to find that BCS proved by clear and convincing evidence the statutory grounds for terminating Father's parental rights pursuant to § 2511(a)(6). However, since the orphans' court did not engage in the needs and welfare analysis pursuant to § 2511(b), we remand the matter for the orphans' court to address that statutory requirement.[6] *See* 23 Pa.C.S. § 2511(b). Accordingly, we reverse the decree denying BCS's petition to terminate Father's parental rights, and we remand the matter for the orphans' court to perform a needs and welfare analysis pursuant to § 2511(b).

Decree reversed. Matter remanded for proceedings consistent with this writing. Jurisdiction relinquished.

**6.** As an error correcting court, we cannot encroach upon the orphans' court's purview as the ultimate trier of fact in order to resolve this case during the instant appeal. Nevertheless, we are constrained to call attention to the fact that Father has failed to contact M.R.B. either directly or indirectly since his birth. Likewise, no evidence exists to suggest that any of Father's family members have pursued any type of contact with M.R.B. Thus, it is clear from the record that no parent-child bond exists between Father and M.R.B. that would be detrimental to M.R.B. if permanently severed. Furthermore, BCS's domestic adoption specialist, Lisa Bills, testified that she supervised M.R.B.'s placement with the prospective adoptive parents on Au-

gust 27, 2010. N.T., 12/7/10, at 48. As of the date of the evidentiary hearing, she has observed M.R.B.'s interaction with the prospective parents on several occasions over the three month's that he was in their care. *Id.* at 48, 50. Ms. Bills's most recent visit with M.R.B. occurred on November 16, 2010, three weeks before the evidentiary hearing. *Id.* at 48. Ms. Bills testified that M.R.B. is thriving in his prospective parents' household. *Id.* at 49. The prospective parents are satisfying M.R.B.'s needs and welfare and share a definite bond with him. *Id.* at 49–50. Thus, Ms. Bills concluded that severing the existing parent-child bond between M.R.B. and prospective parents would be detrimental to M.R.B.'s best interest. *Id.* at 50.