J-A11022-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: P.S.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.L.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 39 MDA 2024 |

Appeal from the Decree Entered December 18, 2023
In the Court of Common Pleas of Lancaster County
Orphans' Court at No: 1804 of 2023

BEFORE: BOWES, J., STABILE, J., and MURRAY, J.

DISSENTING MEMORANDUM BY STABILE, J.: **FILED: SEPTEMBER 10, 2024**

I respectfully dissent. The Majority concludes that the Lancaster County Children and Youth Social Services Agency ("CYA") proved by clear and convincing evidence that Father's conduct satisfies the statutory grounds for termination of parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2).

To satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)).

On this point, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*.

Here, I do not believe that CYA proved the third element for an (a)(2) termination; that the cause(s) of Father's incapacity, abuse, neglect or refusal cannot or will not be remedied, by clear and convincing evidence. The Majority agrees that Father failed to make diligent efforts to reunify with P.S.W. due to "a history of re-incarcerations and relapses over the nine months it took Father to schedule the evaluation; a general lack of initiative to meet the solitary goal he had in order to both visit and ultimately reunify with P.S.W.; and an inability to remain drug-free and in the community." Majority Memorandum, at 9.

Father argues that he completed his sole objective, the psychosexual evaluation. *See* Father's Brief at 19. He further contends that there is no indication in the record that he would cease making the progress necessary to reunify with Child. *See id.* at 19-20. I agree.

Initially, CYA had trouble contacting Father to have him execute the necessary release so that a referral could be made to Commonwealth Clinical Group ("CCG"). *See* N.T., 11/21/2023, at 28. CYA caseworker Summer Weaver attempted to contact him on October 3, 11, 12, 14, and 17, 2022. *See id*. On October 17, 2022, she learned that Father was incarcerated because, for the third time, he reported cocaine use to his probation officer. *See id.* Ms. Weaver then visited Father in prison, and he executed the release. *See id.* at 28-29. CYA made the referral to CCG on November 15, 2022. *See*

*id.* at 29. However, CCG informed Ms. Weaver that they could not complete the evaluation while Father was in prison.[1] *See id.*

Following his release from prison on December 10, 2022, Father was re-incarcerated in February 2023.[2] *See id.* at 29-30. Father was released from prison in late April 2023, and he met with Ms. Weaver on May 18, 2023, during which he advised her that he had scheduled his psychosexual evaluation for June 27, 2023. *See id.*

Father began an inpatient drug and alcohol rehabilitation program on June 14, 2023, and concomitantly informed Ms. Weaver that he would be there until July 10, 2023.[3] *See id.* Father informed Ms. Weaver that he was concerned he may miss the psychosexual evaluation because the evaluation was scheduled to occur before his rehabilitation was completed. *See id.* at 31. Father inquired with Ms. Weaver about completing the evaluation while he was attending inpatient rehabilitation. *See id.* at 55. Ms. Weaver contacted CCG on Father's behalf and, as best we can discern, on the recommendation of CCG, she rescheduled his evaluation for July 31, 2023. *See id.* Thereafter, CCG contacted Father and informed him that they needed

_____

[1] Ms. Weaver learned from Father's probation officer that he was required to spend 45 days incarcerated or participate in a "door-to-door rehabilitation facility," and Father opted for incarceration. It is unclear from the certified record what a "door-to-door rehabilitation facility" entails.

[2] It is unclear from the certified record why Father was re-incarcerated.

[3] As best we can discern from the certified record, Father attended inpatient rehabilitation under his own volition.

to reschedule the evaluation because they did not have an English-speaking therapist for July 31, 2023. *See id.* at 31, 57. After being successfully discharged from his rehabilitation program, Father completed the psychosexual evaluation virtually on August 2, 2023.[4] *Despite CYA knowing Father's evaluation was scheduled and before obtaining any further recommendations from CCG, on July 26, 2023, CYA filed a petition to involuntarily terminate Father's parental rights after only eleven months of P.S.W. being in placement.*

Jessica Lauver, licensed professional counselor at CCG, submitted her report and recommendations on September 26, 2023. Ms. Lauver reported that Father stated he was unaware of any details regarding the sexual abuse allegations against him, all of which were levied at least four years before P.S.W. was born.[5] *See id.* at 14-15, 21, 25. She further stated that there's a possibility that the allegations are "false," and that further evaluation may "clear them up." *See id.* at 22.

Moreover, the findings of Father's psychosexual evaluation were indeterminate. Ms. Lauver testified as follows:

---

[4] Ms. Lauver testified that she believed Father requested the evaluation occur virtually because by the time the psychosexual evaluation occurred in August 2023, he was residing in Philadelphia, Pennsylvania. *See* N.T., 11/21/2023, at 19-20. She further testified that it is not uncommon to conduct the evaluation virtually. *See id.* at 6.

[5] The details of these reports are absent from the record. Father was not convicted of any crimes stemming from these allegations. *See* N.T., 11/21/2023, at 14-15, 55.

Q: [W]ith regard to [Father], what were your recommendations at the conclusion of the evaluation?

A: [T]he general consensus here is the idea that [Father] should be evaluated further[.]

[T]he recommendation is that he needs to present for more in-depth therapy over a longer period of time to evaluate and that [would] culminate with the use of a therapeutic polygraph which allows us to verify the information that we gather from [Father.]

Once we gather that information, it's verified true, if [] he's being truthful, there are no serious concerns of any sexual allegation, he's deemed a protective factor.

\* \* \* \*

Q: [F]or [Father], because of his [] alleged past history, you wanted him polygraphed?

A: Correct.

Q: So you don't know whether or not he's being honest in his self-reporting or his lack of knowledge of these incidents so that's your reason for these recommendations?

A: Specific to the polygraph?

Q: Well, the supervised contact with [Child], the specialized individual therapy -- I mean, those.

A: Yeah, all of it is to allow him time, like I said, to have the information, you know provided to use in better and greater detail . . . you know, build a therapeutic rapport. It's difficult to talk about some of those topics with somebody that you don't know. You build a therapeutic rapport, you verify, you continue to process through your history, then that is given over to a polygraph examiner to conduct the polygraph to verify [the answers Father] gave during that time[],and from there we make additional recommendations.

N.T., 11/21/2023, 6-7, 18-19. As such, Ms. Lauver recommended that Father

participate in an additional evaluation that would include a therapeutic

polygraph test to determine if he posed any serious concerns as it would relate to P.S.W.[6]  ***See id.*** at 6-7, 18-19.  We also emphasize Father's testimony on direct examination, as follows.

Q: Is there anything else you would like the [j]udge to know?

A: [L]ike I said before, I know as a man I made mistakes.  My time was limited.  I was in and out [of] incarceration and that's on me.  I understand that.  I still just want a chance at whatever I got to do just to get it right. . . .  I just want that chance [to] be her father.

***Id.*** at 61.

Thus, I would conclude that CYA failed to satisfy its burden of proving by clear and convincing evidence "that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied."  23 Pa.C.S.A. § 2511(a)(2); ***A.H.***, 247 A.3d at 443.  Although Father was at fault for the initial roadblocks preventing the completion of the evaluation, he ultimately began making progress.  Additionally, the testimony provided revealed a need for further psychosexual evaluation to determine whether Father poses a risk to P.S.W., and, if so, what services would be recommended.  In my opinion, these facts do not demonstrate, as the Majority has concluded, that the cause(s) of Father's incapacity cannot or will not be remedied to justify termination by clear and convincing evidence.

---

[6] Ms. Lauver testified that she does not always recommend a therapeutic polygraph but did so for Father because the initial evaluation was inconclusive. ***See*** N.T., 11/21/2023, at 18-19.

Although the Majority affirmed based on Section 2511(a)(2), therefore obviating the need to consider any other basis for termination by the trial court, the orphans' court found additional grounds for involuntary termination pursuant to Section 2511(a)(1) and (6).  I address each in turn and would conclude similarly that CYA did not prove termination under these alternative grounds by clear and convincing evidence.

To establish grounds for termination pursuant to Section 2511(a)(1) "[a] petitioner. . . must demonstrate by competent, clear and convincing evidence, '[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.'"  **C.M.**, 255 A.3d at 363-64 (citation omitted) (footnote omitted).  While undefined,

> our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship.  The roster of such positive actions undoubtedly includes communication and association.  The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

**In re Adoption of L.A.K.**, 265 A.3d 580, 592 (Pa. 2021) (internal citations and quotation marks omitted).  Furthermore, "[f]ortitude is required, as a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a

more suitable time to perform parental responsibilities." *Id.* at 592 (citation omitted).

In assessing Section 2511(a)(1), trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592.

"[T]he question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977). Thus, "even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months. . ., the court 'must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].'" *L.A.K.*, 265 A.3d at 593. The totality of the circumstances includes consideration of the following: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." *Id.* As explained by our Supreme Court,

"the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances." *Id.*

Instantly, the orphans' court found the following regarding Section 2511(a)(1):

> Father has failed to address [CYA's] concerns regarding his criminal history and his history of sexual abuse. It took Father over ten (10) months to complete the initial psychosexual evaluation that was ordered on September 27, 2022. During that period, Father has provided no care, love, or support for the Child. Father was not working on his sole reunification objective. Father has never reached out to the [c]aseworker to see how the Child is doing or see how the Child is developing. Father presented no evidence of a "continuing interest in the [C]hild and a genuine effort to maintain communication and association with the [C]hild." **C.M.S.**, [**supra** at 462]. While Father would ask about the Child during his infrequent communications with the [c]aseworker, he never reached out to the [c]aseworker himself. The [c]aseworker was always the one to initiate communication with Father. During the time the [c]ourt gave Father to work on reunification, he has failed to perform essential parental duties because of his drug addiction, recidivism, and lack of contact with [CYA].

Orphans' Court Opinion, 1/30/2023, at 6-7.

Upon review, I would conclude the certified record does not support the orphans' court's findings. Primarily, contrary to the court's assertion, testimony from Ms. Weaver indicated that Father was working towards his sole reunification objective, *i.e.*, completing a psychosexual evaluation at CCG. Ms. Weaver testified that when she met with Father on May 18, 2023,

- 9 -

he informed her that he had scheduled the psychosexual evaluation for June 27, 2023. *See* N.T., 11/21/2023, at 30. However, as discussed above, Father testified that he was trying to complete the evaluation during the course of his inpatient rehabilitation program, and that Ms. Weaver ultimately rescheduled that for July 31, 2023. *See* N.T., 11/21/2023, at 55. Ms. Weaver testified that "the plan was for [the evaluation] to be in person, [so we] agreed [] that I would reschedule it." *See id.* at 31. Father completed the psychosexual evaluation virtually on August 2, 2023. Despite doing this, CYA already had filed a petition seeking the involuntary termination of Father's parental rights on July 27, 2023. At the time CYA filed the petition, P.S.W. had been in placement for eleven months.

Further, although the orphans' court suspended Father's visitation pending the psychosexual evaluation, Father maintained a continuing interest in P.S.W. Although Ms. Weaver reported difficulties reaching Father at the outset of the case, she also testified that Father would inquire about P.S.W. when they met. *See id.* at 35, 57. In addition, contrary to the orphans' court's findings, Ms. Weaver testified that "there have been several times throughout the duration of the case that [Father] had called me." *Id.* at 44. Father confirmed that he would ask Ms. Weaver how P.S.W. is doing, and Ms. Weaver showed him pictures. *See id.* at 57.

The certified record demonstrates that Father was attempting to reestablish contact with P.S.W. by completing his sole permanency objective,

the psychosexual evaluation. As discussed above, the evaluation was inconclusive, and Ms. Lauver testified that Father required further assessment. In addition, it is important to note that Father also successfully completed a drug and alcohol rehabilitation program, and he attempted to initiate contact with Ms. Weaver as well and inquired about P.S.W. when they spoke.

As such, the record demonstrates that Father was not sitting idly by, but rather attempted to perform parental duties for P.S.W. in the six months preceding the filing of the subject petition. *See* 23 Pa.C.S.A. § 2511(a)(1); *L.A.K.*, 265 A.3d at 593 ("the court 'must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].'"). Based upon the foregoing, I would also conclude that CYA failed to meet its burden of proof pursuant to Section 2511(a)(1).

Turning to Section 2511(a)(6), that provision provides:

> (6) In the case of a newborn child, the parent knows or has reason to know of the child's birth, does not reside with the child, has not married the child's other parent, has failed for a period of four months immediately preceding the filing of the petition to make reasonable efforts to maintain substantial and continuing contact with the child and has failed during the same four-month period to provide substantial financial support for the child.

23 Pa.C.S.A. § 2511(a)(6).

I again would conclude that the orphans' court erred in finding that CYA met its burden of proof inasmuch as it applies exclusively to a "newborn child."

- 11 -

*See In re Adoption of M.R.B.*, 25 A.3d 1247, 1253-1254 (Pa. Super. 2011). The Adoption Act defines a "newborn child" as "[a] child who is six months of age or younger at the time of the filing of any petition pursuant to Chapter 25 (relating to proceedings prior to petition to adopt." 23 Pa.C.S.A. § 2102. At the time CYA filed the petition seeking the involuntary termination of Father's parental rights, in July 2023, P.S.W. was already eleven months old. Therefore, pursuant to the Adoption Act, P.S.W. was no longer considered a "newborn child." Thus, I find that the orphans' court abused its discretion in finding that CYA satisfied its burden under Section 2511(a)(6).

Accordingly, I would conclude that the orphans' court abused its discretion by involuntarily terminating Father's parental rights pursuant to Section 2511(a)(1), (2), (6). Moreover, since I would conclude that CYA failed to meet its burden under Section 2511(a), there is no need to address Father's final issue which relates to Section 2511(b). *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super 2007) ("Only if the court determines that the parents conduct warrants termination of his or her parental rights [pursuant to Section 2511(a)] does the court engage in the second part of the analysis pursuant to Section 2511(b).").

I respectfully dissent.