J-S34045-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF C.S.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.T., IV, BIRTH FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 407 WDA 2019 |

Appeal from the Decree Entered February 15, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): A-89 of 2018

BEFORE: DUBOW, J., McLAUGHLIN, J., and COLINS*, J.

MEMORANDUM BY COLINS, J.: **FILED AUGUST 27, 2019**

Appellant, J.T., IV ("Father"), appeals from the decree entered February 15, 2019, that involuntarily terminated his parental rights to his biological child, C.S.S. ("Child"), born May 2018.[1] We affirm.

The facts and procedural history underlying this appeal are as follows. B.L.S. ("Mother") and Father dated between September 2017 and January 2018. N.T. at 44-49, 53-54. Mother became pregnant, confirming the pregnancy in December 2017 at a mobile clinic to which Father transported her. After Mother and Father ended their relationship, Father blocked Mother from contacting him on social media and by telephone.

_____

[1] Child's mother, B.L.S., consented to the termination of her parental rights and has not participated in this appeal.

_____

* Retired Senior Judge assigned to the Superior Court.

In April 2018, Mother determined that she wanted to have Child placed for adoption and contacted Three Rivers Adoption Council ("TRAC"), a licensed child placement agency. *Id.* at 11. Mother informed TRAC that Father was Child's father. *Id.* TRAC arranged a private adoption. *Id.* at 21.

On May 6, 2018, Mother began sending text messages to the telephone of Father's fiancée, D.C., about Child's impending birth. Exhibit Agency-1 at 1; N.T. at 49-50. In the exchanges, Mother stated that she intended to have Child adopted and asked that Father "sign these court papers so he can terminate his rights to the baby[,]" and Father offered to take Child if it was determined that he was Child's biological father. Exhibit Agency-1 at 1-3; N.T. at 50.

Mother was originally given a due date of June 10, 2018, which was later revised to June 13, 2018, and she provided this information to TRAC. Exhibit Agency-3; N.T. at 67, 129. Child was born at the end of May 2018. Although Father was not listed on Child's birth certificate, Mother executed an affidavit of paternity five days after Child's birth, naming Father. Petition for Involuntary Termination of Parental Rights, 10/4/2018, Exhibit A (birth certificate) & Exhibit C (affidavit of paternity).

Mother sent text messages to D.C.'s telephone when she was on the way to the hospital to give birth and when Child was born, and Mother invited Father to the hospital. Exhibit Agency-1 at 20 ("Fyi this baby should be out tonight" [sic]), 21 ("Hes here" [sic]), 24 ("If yinz wanted 2 come now

u could but I dont see yinz doing that" [sic]), 27 ("Were u stopping or no" [sic]); N.T. at 51-52.[2]  Father did not visit Child in the hospital.  ***Id.*** at 51.[3]

Two days after Child was born, he left the hospital with his pre-adoptive family.  ***Id.*** at 52.  Mother sent a text message to D.C.'s telephone: "hes with his adoption family" [sic].  Exhibit Agency-1 at 31.  The next day, which was still in May 2018, Mother and D.C. exchanged text messages for the last time.  ***Id.*** at 33-36.[4]

On October 4, 2018, TRAC filed a petition for involuntary termination of Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(6).[5] TRAC also filed a petition to confirm Mother's consent to adoption and a report of intention to adopt with respect to Child's proposed adoptive parents.

_____

[2] There is no indication in the text messages in the record that Mother ever informed Father that "if he wanted to take the baby, that was his choice[,]" as the director of adoption and foster care services for TRAC, Ja-Neen Jones, testified that she told Mother to do.  N.T. at 15.

[3] In response to Mother's text messages, D.C. wrote:  "He wants to know who he has to talk to no one is giving him any answers what the next step is cuz he's not signing his rights over"; and "he's gotta go to work".  Exhibit Agency-1 at 20, 24.

[4] Mother appears to have sent a photograph of Child and a text message, "He looks just like him[,]" to D.C.'s telephone on August 18, 2018, but there is no indication in the record that a response was sent from D.C.'s telephone.  ***Id.*** at 37; N.T. at 50.

[5] The petition does not cite to 23 Pa.C.S. § 2511(b) nor refer to the needs and welfare of Child.  ***See generally*** Petition for Involuntary Termination of Parental Rights, 10/4/2018.

On December 6, 2018, the trial court appointed counsel to represent Father and ordered DNA testing of Child and Father, with costs for the paternity test divided equally between Father and TRAC. Order of Court, 12/6/18. The test determined there was a 99.9998% probability of paternity. Exhibit Agency-2. On January 7, 2019, the trial court appointed a guardian *ad litem* ("GAL") for Child and ordered her to "file a written report of her findings"; on January 24, 2019, the trial court appointed separate legal counsel for Child.[6]

On February 4, 2019, GAL filed the court-ordered report, stating that she had "visited the home of the prospective adoptive parents on February 1, 2019" and that Child has "met or exceeded all developmental milestones[,]" "is clearly bonded to this [pre-adoptive] family[,] and all his needs are being met." Report of GAL, 2/4/2019, at 5.

_____

[6] ***See In re L.B.M.***, 161 A.3d 172, 173-75, 180 (Pa. 2017) (courts must appoint counsel to represent the legal interests of any child involved in a contested involuntary termination proceeding; a child's legal interests are distinct from his or her best interest, in that a child's legal interests are synonymous with the child's preferred outcome, and a child's best interest must be determined by the court); ***cf. In re T.S.***, 192 A.3d 1080, 1089-93 (Pa. 2018) (a child's statutory right to appointed counsel is not waivable, even where the child is too young or nonverbal to communicate his or her preference; reaffirming the ability of an attorney-guardian *ad litem* to serve a dual role and to represent a child's non-conflicting best interests and legal interests); ***In re G.M.S.***, 193 A.3d 395, 399-400 (Pa. Super. 2018) (orphans' court not required to appoint separate attorney to represent children's legal interests, so long as children's guardian *ad litem* was an attorney and children's legal and best interests did not appear to be in conflict).

At the termination hearing on February 11, 2019, Ja-Neen Jones, the director of adoption and foster care services for TRAC, testified that Father called her once, on May 9, 2018. N.T. at 13-14. Jones acknowledged that, during the two-minute conversation, Father questioned Child's paternity. *Id.* at 14, 31. She continued that Father did not ask for custody or visitation and denied that "TRAC ever tr[ied] to keep [C]hild from the [F]ather." *Id.* at 15, 43. To the best of her knowledge, Father never filed a complaint for custody, and neither he nor D.C. ever sent cards, clothing, financial support, formula, gifts, or letters to Child or contacted TRAC again, even though she told him that he could call her back if he had any other questions. *Id.* at 16, 20.

When asked if "the pre-adoptive parents [are] meeting [Child's] educational and psychological and developmental needs[,]" Jones answered affirmatively, whereas, when she was asked if Father were "meeting any of [Child's] needs[,]" she answered negatively. *Id.* at 18. Jones testified that she had seen Child "[j]ust once." *Id.* at 17.

Mother initially testified that, prior to Child's birth, Father never questioned paternity, although he suggested pursuing an abortion instead of parenting Child. *Id.* at 46, 74. She later stated that she did not name Father on Child's birth certificate, because Father insisted Child was not his, although she did not clarify as to when Father began denying that he was Child's father. *Id.* at 53. She affirmed that she and Father first had sexual

relations on September 27, 2017. *Id.* at 54. She attested that she was unwilling to agree to wait to give Child to Father until after Father had a DNA test performed, because "[h]e made no initiative. I even offered him pictures when the baby was born, the size, the weight, everything. Nothing." *Id.* at 70-71.

Father testified that he had sexual relations with Mother for the first time in October 2017 and that Mother had told him that her due date was June 2018. *Id.* at 84-85. Father continued that, following confirmation of Mother's pregnancy, he told her "right before Christmas" 2017 that he "didn't think it was [his child,]" but, if paternity were confirmed, he wanted to rear the child. *Id.* at 83-86. When asked "[w]hat made him suspicious that this child might not be [his,]" Father answered that Mother began a relationship immediately after they had separated and that she had contact with her former boyfriend while she and Father were still together. *Id.* at 86. He continued that Mother was receiving "messages and comments on Facebook" from "[o]ther guys" that he described as "a little too flirty." *Id.* He also questioned the due date, because he "wasn't allowed in the doctor's appointments." *Id.* at 91.

Father testified that he "was telling [D.C.] what to say" in the text messages exchanged between Mother's and D.C.'s telephones beginning on May 6, 2018, and ending three days after Child's birth. *Id.* at 90-91.

Father further testified that he called Jones on May 9, 2018, and told her that he wanted to stop the adoption if he was the father of Mother's son. *Id.* at 93. He asserted that Jones told him that "there was nothing that they could do[,]" that he "needed to get an attorney[,]" and that she "wouldn't tell [him] nothing without an attorney." *Id.* at 93, 112; *see also id.* 115. He continued that, when he asked Jones about a paternity test, she told him that "they didn't do that kind of thing" and that, when he asked for attorney referrals, she told him that she could not help him. *Id.* at 93. When asked why he did not contact TRAC again after Child's birth, he answered, "They already told me there was nothing they could do until I got an attorney." *Id.* at 106.

Father stated that, on the same day as this telephone call to TRAC, he "called four different attorney" who he found through a Google search for "family lawyers[,]" but "[t]he cheapest one [he] found was $1,500 deposit down[.]" *Id.* at 94, 97, 112. He explained that he "was basically telling them of the situation of what was going on" and "told them that [he] wanted to raise [his] child" and "needed to get an attorney to get a DNA test." *Id.* at 112. He testified that he then called a fifth attorney who represented his father but that this attorney never returned his calls. *Id.* at 95, 112.

Father added that he then "came down here to family division" of the Court of Common Pleas of Allegheny County on a friends' recommendation but was told that "they had no record of the child[.]" *Id.* at 95-96, 99. He

testified that he "was asking them is there a way that [he] could get a cheap attorney or to help [him] find a cheap attorney so [he] could get a DNA [test.]" *Id.* at 96. Father then testified that he "went upstairs to the Public Defender's Office" but "[t]hey said that they couldn't help me, that was not their thing." *Id.* at 97.

Father testified that he earns $14.00 per hour as a delivery driver and that, after Child was born, he "was saving money" to hire an attorney, but he stated: "I wasn't able to save much money out of my checks because of my bills but I was trying to save some money to get an attorney." *Id.* at 80-81, 98. Father added that he did not learn that he could have counsel appointed until he received the notice of the hearing to terminate his parental rights on October 5, 2018. *Id.* at 98-99. He noted that he left school in eleventh grade, never obtained a GED or additional education, had never had to hire an attorney before, was never in the court system before, and had never even heard of Orphans' Court before the current matter. *Id.* at 79, 99.

D.C., Father's fiancée, testified that she was with Father when he went to the family division and the Public Defender's Office. *Id.* at 126.

GAL informed the trial court that "[C]hild is well bonded in [the pre-adoptive] home[.]" *Id.* at 142.

The trial court did not make any findings of fact or a ruling at the conclusion of the hearing. *Id.* at 144-45.

On February 15, 2019, the trial court granted the termination petition pursuant to 23 Pa.C.S. § 2511(a)(6). The decree did not cite to 23 Pa.C.S. § 2511(b) but stated: "Th[e trial c]ourt further finds that terminating the parental rights bests serves the development, physical and emotional needs and welfare of the child." Final Decree, 2/15/2019, at ¶ 3.

On March 14, 2019, Father filed this timely direct appeal, along with a concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i). The trial court entered its opinion on April 4, 2019, *see* Pa.R.A.P. 1925(a)(2)(ii), in which it made the following credibility determinations:

> According to [F]ather, he intended to first have a confirming paternity test and would then make contact with [C]hild and undertake any financial obligations. [F]ather's testimony was not credible in that regard or in any aspect. . . .
>
> [T]o the extent any contact occurred with [M]other, it occurred only through texts delivered through the phone of [F]ather's girlfriend. The [trial] court does not find the testimony regarding such texts wholly credible. . . .
>
> Nor does the [trial] court find the testimony by and on behalf of [F]ather credible as to efforts to secure counsel.

Trial Court Opinion, filed April 4, 2019, at 3-4.

Father presents the following issues for our review:

> I.     Whether the trial court abused its discretion in finding that TRAC proved all of the elements necessary to terminate Father's parental rights under 23 Pa. C.S.A. § 2511(a)(6) when the agency actively placed barriers to Father's request for genetic testing by refusing to facilitate testing once the child was born.
>
> II.     Whether the trial court's findings that terminating Father's parental rights best served the child's development, physical and

emotional needs and welfare is supported by the evidence presented?

III. Whether Father's due process rights under the Pennsylvania [C]onstitution and the United States [C]onstitution were violated when TRAC, as a government sanctioned provider of adoptive services, did not advise Father that he would be eligible for a court appointed attorney once the Petition to terminate his parental rights was filed.

Father's Brief at 4 (trial court's answers omitted).

We consider Father's issues in light of our well-settled standard of review:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result.

*In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (internal quotation marks and some internal citations omitted) (some formatting). "A decision to terminate parental rights [is] never to be made lightly or without a sense of

- 10 -

compassion for the parent[.]" *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. "Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights." *B.J.Z.*, 207 A.3d at 921 (citation omitted).

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re G.M.S.*, 193 A.3d 395, 401 (Pa. Super. 2018) (citation omitted).

## 23 Pa.C.S. § 2511(a)(6)

In the instant action, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(6):

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .
>
> > (6) In the case of a newborn child,[7] the parent knows or has reason to know of the child's birth, does not reside

---

[7] Section 2102 of the Adoption Act defines a "newborn child" as less than six months old at the time the petition for termination is filed. 23 Pa.C.S. § 2102. Subsection 2511(a)(6) includes a four-month review window to examine the parent's conduct. *Id.* § 2511(a)(6). Accordingly, pursuant to the statutory framework, a moving party has only two months within which
*(Footnote Continued Next Page)*

> with the child, has not married the child's other parent, has failed for a period of four months immediately preceding the filing of the petition to make reasonable efforts to maintain substantial and continuing contact with the child and has failed during the same four-month period to provide substantial financial support for the child.

23 Pa.C.S. § 2511(a)(6).

> Father argues that while he does not reside with [C]hild and has not married [C]hild's mother, the remaining elements of that Section 2511(a)(6) have not been proven. While Father knew that Mother had given birth to a child on May [], 2018 . . . , he did not know it was his child.

Father's Brief at 13 (emphasis in original). The crux of Father's argument is that he was under no obligation to pursue custody or any parental responsibilities until after a paternity test confirmed that he was Child's biological father. *Id.* at 12-13.

Preliminarily, we note that, unlike other subsections of 23 Pa.C.S. § 2511(a), there is a paucity of case law interpreting 23 Pa.C.S. § 2511(a)(6). Pursuant to our research, we discovered no case law by the Supreme Court of Pennsylvania interpreting this subsection and only three published opinions by this Court: *In re C.M.S.*, 832 A.2d 457 (Pa. Super. 2003), *T.J.B. v. E.C.*, 652 A.2d 936 (Pa. Super. 1995), and *In re M.R.B.*, 25 A.3d 1247 (Pa. Super. 2011).

*(Footnote Continued)* ──────────────

it is permitted to file a petition seeking to terminate parental rights pursuant to § 2511(a)(6). *See In re Adoption of M.R.B.*, 25 A.3d 1247, 1253-54 (Pa. Super. 2011).

In **C.M.S.**, there was no question of paternity. **See** 832 A.2d at 459.[8] **T.J.B.** and **M.R.B.**, however, both involved fathers who knew that a baby had been born but who questioned the paternity of the child and who delayed pursuing their parental obligations until after a DNA test confirmed paternity. 652 A.2d at 944; 25 A.3d at 1259-60. In his brief to this Court, Father relies upon **T.J.B.** and argues that **M.R.B.** can be distinguished from his case. Father's Brief at 15-17, 19-24.

In **T.J.B.**, this Court affirmed the trial court's denial of a termination petition, where there was a legitimate question as to the paternity of the child, which the father had doubted from the outset. 652 A.2d at 939-41, 944-45.

In **M.R.B.**, 25 A.3d at 1249-50, this Court reversed the decree of the trial court denying a petition filed by a licensed child placement agency to terminate the parental rights of a biological father to his minor son pursuant to § 2511(a)(6). This Court concluded:

> unlike the factual scenario underlying **T.J.B.**, there was no legitimate question of paternity . . . Father shared an exclusive residence with Mother when their son was conceived . . . Father did not even raise the issue of paternity tangentially with his attorney until after Mother moved from the residence . . . Father apparently considered contesting paternity as a legal maneuver in response to the proposed adoption[.]

---

[8] The analysis of subsection 2511(a)(6) in **C.M.S.** was minimal, as the termination petition therein was also filed pursuant to subsection 2511(a)(1), and this Court found that the father met the statutory requirements of subsection 2511(a)(1). 832 A.2d at 459, 464-66.

***M.R.B.***, 25 A.3d at 1259-60. As "there was no legitimate question of paternity" in ***M.R.B.***, *id.* at 1259, the father's failure to pursue his parental responsibility promptly was inexcusable.

In the current action, Father testified that he questioned whether he was the baby's father as soon as Mother's pregnancy was confirmed, N.T. at 83-86, and that he had legitimate reasons for refraining from pursuing a relationship with Child until after he could obtain the results of a paternity test. Specifically, Father asserted that Child had been born two to three weeks earlier than the due date provided by Mother both to him and to TRAC, and he questioned why he was not allowed in the doctor's appointments. *Id.* at 84-86, 91; ***see also*** Exhibit Agency-3; N.T. at 67, 129.[9] Father also testified that Mother had still been in contact with her former paramour during his relationship with her and that she had received messages and Facebook comments from other men while dating Father, again causing him to suspect that he and Mother did not have an exclusive relationship. *Id.* at 86.

_____

[9] Father provided no evidence as to whether a birth occurring two to three weeks earlier than the expected due date was atypical or was a legitimate reason to doubt the date of conception. Father testified that he also questioned Child's paternity, because Mother began dating someone else immediately after he and she separated, although Child's early arrival seems to have undermined any argument that Child was conceived later. N.T. at 86.

Nevertheless, we need not reach the inquiry as to whether the reasons given by Father for questioning the paternity of Child were "legitimate," because the trial court did not believe any of Father's testimony. Trial Court Opinion, filed April 4, 2019, at 3. We must defer to the trial court's credibility determinations, *B.J.Z.*, 207 A.3d at 921, and thus cannot give credence to any of Father's evidence – including Father's explanation for doubting that he was Child's biological father. N.T. at 83-86, 91.

Without any credible reasons on the record, "there was no legitimate question of paternity[,]" and, as in *M.R.B.*, 25 A.3d at 1259, Father's failure to immediately pursue custody of or visitation with Child was unacceptable. *Contra T.J.B.*, 652 A.2d 936. Hence, Father had no legitimate basis for postponing "reasonable efforts to maintain substantial and continuing contact with [C]hild" due to reservations about Child's paternity. 23 Pa.C.S. § 2511(a)(6).

*T.J.B.* can be further differentiated from the current appeal, besides the issue of whether there was a "legitimate question" of paternity. Specifically, the father in *T.J.B.* retained an attorney shortly after the child's birth to dispute paternity and to represent him if the paternity tests demonstrated that he was the father; had and paid for the required genetic

tests less than two months after the child's birth;[10] acknowledged paternity within one month of receiving the test results; and filed a petition for custody less than three months after paternity was confirmed. 652 A.2d at 940-41, 944-45. All of these actions occurred during Section 2511(a)(6)'s four-month review window. This Court therefore found that the father's actions constituted reasonable efforts to maintain substantial and continuing contacts with the child.

In the current case, the trial court did not find any of Father's testimony credible, including his testimony about his efforts to obtain a paternity test or to retain counsel, nor did it believe D.C.'s testimony about Father's efforts to find an attorney. Trial Court Opinion, filed April 4, 2018, at 3-4. Again, we must defer to the trial court's credibility determinations. *B.J.Z.*, 207 A.3d at 921. Accordingly, we cannot consider any of Father's or D.C.'s testimony about: Father beginning the process to determine paternity shortly before Child's birth; Father's attempts to hire an attorney, to seek a *pro bono* attorney, or to have an attorney appointed if the paternity test demonstrated that he was Child's father; or Father's minimal

---

[10] *T.J.B.* is more than two decades old, and, at the time, a paternity test "[could ]not be conducted on a child until after the child is born." 652 A.2d at 939 n.1.

education and lack of familiarity with the legal system. N.T. at 79, 93-99, 112, 115, 126.[11]

The only pieces of evidence of Father's efforts that may be considered consequently are: Jones's statement that Father called her once, spoke to her for two minutes to contest paternity, and never contacted TRAC again; and Mother's testimony about and copies of text messages sent amongst D.C.'s and Mother's telephones, stating Father wanted to rear the baby if a DNA test established his paternity. N.T. at 14-16, 20, 31, 43, 50; Exhibit Agency-1 at 1-3. However, the telephone call between Father and Jones occurred on May 9, 2018, and the exchange of text messages ceased by the end of May 2018. N.T. at 13; Exhibit Agency-1 at 33-36. Section 2511(a)(6) states that the timeframe to be considered is the "period of four months immediately preceding the filing of the petition[.]" 23 Pa.C.S. § 2511(a)(6). The trial court determined that the relevant time frame, based on the filing of the petition for involuntary termination of Father's parental rights on October 4, 2018, began on June 4, 2018. Trial Court Opinion, filed April 4, 2019, at 2. No party contested this calculation, and we agree that only evidence of Father's actions between June 4, 2018, and

---

[11] As we must accept the trial court's finding that Father never made any effort to find an attorney, we need not reach the question of whether Father's economic status affected his ability to secure counsel and thus whether his finances indirectly affected the termination of his parental rights. *See* N.T. at 81, 98.

October 4, 2018, are relevant. Ergo, Father's telephone call and the text messages cannot be considered, because they did not occur in the pertinent statutory review period.

*T.J.B.* can be further distinguished from the current action, because, whereas the father in *T.J.B.* paid for the paternity test, Father only paid half of the cost, sharing it with TRAC. ***Compare id.*** at 944-45 ***with*** Order of Court, 12/6/18.[12] Furthermore, in contrast to the father in *T.J.B.*, Father never even discussed filing for custody of Child, let alone filing a complaint for custody or a petition for visitation. ***Compare*** 652 A.2d at 940-41, 945 ***with*** N.T. at 15-16.[13] Consequently, although superficially similar, *T.J.B.* can be distinguished from the instant appeal for a multitude of reasons and is ultimately inapposite, and Father's reliance upon it to demonstrate that his

_____

[12] Again, the trial court was "free to believe all, part, or none of the evidence presented" and did not find any of Father's testimony to be credible. *B.J.Z.*, 207 A.3d at 921; Trial Court Opinion, filed April 4, 2019, at 3-4. Thus, we cannot accept any of Father's testimony about his income and, therefore, need not reach any question of whether Father could afford to pay the entire cost of a paternity test. *See* N.T. at 81, 98.

[13] In *T.J.B.*, 652 A.2d at 939, the father contested paternity as soon as the mother "informed him that she was carrying his child." In the instant case, Mother gave ambiguous testimony as to when Father began disputing Child's paternity, N.T. at 46, 53, 74, and, as the trial court found Father's testimony not to be credible, we cannot consider his testimony that he challenged Child's paternity as soon as Mother's pregnancy was confirmed. *Id.* at 83-86. As the trial court made no findings of fact as to whether Father questioned paternity from the outset, we cannot usurp the trial court's role as fact-finder, especially when there is ambiguity in the record. We therefore cannot determine whether the instant matter is analogous to *T.J.B.* in that respect.

conduct amounted to "reasonable efforts to maintain substantial and continuing contact with the child" for purposes of 23 Pa.C.S. § 2511(a)(6) is misplaced.  ***See*** Father's Brief at 15-17.

Accordingly, no credible evidence was presented establishing that Father made reasonable efforts towards obtaining custody or fulfilling his parental duties during the four months preceding the filing of the termination petition.  For these reasons, the trial court did not err nor abuse its discretion in finding that the statutory grounds for terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(6) were established.  ***See B.J.Z.***, 207 A.3d at 921; ***M.R.B.***, 25 A.3d at 1260.

### **23 Pa.C.S. § 2511(b)**

The written decree involuntarily terminating Father's parental rights to Child, dated February 15, 2019, specifically stated that Father's rights were terminated pursuant to 23 Pa.C.S. § 2511(a)(6).  Final Decree, 2/15/2019, at ¶ 2.  The written decree made no explicit mention of 23 Pa.C.S. § 2511(b) nor did the trial court make any findings pursuant to subsection 2511(b) at the termination hearing.  ***See*** N.T. at 144-45; ***see generally*** Final Decree, 2/15/2019.  In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court merely stated that "[F]ather had no contact with [C]hild and it is as plain that there were no reasonable efforts to initiate, let alone maintain such contact."  Trial Court Opinion, filed April 4, 2019, at 3.

As explained above, "[o]ur case law has made clear that under Section 2511, the court **must** engage in a bifurcated process prior to terminating

- 19 -

parental rights." **_B.J.Z._**, 207 A.3d at 921 (emphasis added). Consequently, we could vacate the order and remand this case due to the trial court's failure to include any clear reference to subsection 2511(b) in its decree terminating Father's parental rights. However, as the decree stated, "[the trial c]ourt further finds that terminating the parental rights best serves the development, physical and emotional needs and welfare of the child[,]" Final Decree, 2/15/2019, at ¶ 3, we will accept that the trial court performed the required bifurcated analysis pursuant to § 2511 and will not permit the trial court's oversight in its written decree to preclude us from reaching the merits of Father's appeal.

Turning to Father's substantive issue, the language of subsection 2511(b) states:

> The court in terminating the right of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the condition described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

> Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be

considered by the court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*G.M.S.*, 193 A.3d at 401 (citation and internal brackets omitted) (some formatting). "[I]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re Q.R.D.*, 2019 PA Super 199, \*13 (filed June 25, 2019) (citation omitted).

As noted above, Jones testified that the pre-adoptive family was meeting Child's educational, psychological, and developmental needs. N.T. at 18. GAL reported that Child has "met or exceeded all developmental milestones[,]" "is clearly bonded to this [pre-adoptive] family[,] and all his needs are being met." Report of GAL, 2/4/2019, at 5. GAL also represented to the trial court that Child was "well bonded" in the pre-adoptive home. N.T. at 142. Although Father contends that Jones and GAL were not familiar enough with Child or the pre-adoptive family to properly evaluate their relationship, as each observed Child in his pre-adoptive home only once, Father presented no evidence contradicting their assessments. Father's Brief at 24-25; *see also* N.T. at 18; Report of GAL, 2/4/2019, at 5. Consequently, the evidence established that this placement has afforded Child with an "emotional bond" and with permanency for a substantial part

of his young life and has fulfilled "the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b); *G.M.S.*, 193 A.3d at 401.

By contrast, Jones testified that Father has not provided for any of Child's needs, including no cards, clothing, financial support, formula, gifts, or letters to Child. N.T. at 16, 18. Again, no contradictory evidence was offered, and Father does not dispute that "no bond has been able to develop" between himself and Child. Father's Brief at 26.[14] Consequently, competent evidence established that Father had not provided for the "developmental, physical and emotional needs and welfare of the child" pursuant to 23 Pa.C.S. § 2511(b) and does not share an "emotional bond" with Child. *G.M.S.*, 193 A.3d at 401; *see also B.J.Z.*, 207 A.3d at 921.

---

[14] Father contends that the current lack of bonding between himself and Child "does not mitigate against the possibility of such a bond developing once the impediments to it are removed. Surely a child who is already in daycare at eight months of age is capable of bonding with adults other than his adoptive parents, or, for that matter, with daycare attendants." Father's Brief at 26. However, we find no case law – and Father provides us with none – allowing a court to consider the potential for an emotional bond to develop, as opposed to analyzing whether an emotional bond currently exists.

Moreover, assuming it were proper for the court to weigh the possibility of a future emotional bond developing, it would be "only one of many factors to be considered by the court when determining what is in the best interest of the child[,]" *G.M.S.*, 193 A.3d at 401, and the court would still have to consider the "developmental, physical and [other] emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b).

Accordingly, we conclude that the trial court did not abuse its discretion in holding that "terminating the parental rights bests serves the development, physical and emotional needs and welfare of the child." Final Decree, 2/15/2019, at ¶ 3. The record supports the trial court's view that the involuntary termination of Father's parental rights will serve the developmental, physical, and emotional needs and welfare of Child pursuant to Section 2511(b).

### Due Process

Finally, Father contends that his "due process rights under the Pennsylvania Constitution and the United States Constitution were violated when TRAC, as a government sanctioned provider of adoptive services, did not advise Father that he would be eligible for a court appointed attorney once the Petition to terminate his parental rights was filed." Father's Brief at 27-28. He continues that his due process rights are involved, because "a fundamental right - to raise his child - is impacted by the obstacles placed in his way by TRAC." *Id.* at 35. Father adds that TRAC treated him and Mother inequitably, as it provided Mother with assistance but did not help him to obtain a paternity test, and he further faults TRAC for failing to suggest that he contact the agency again after Child was born. *Id.* at 31-32.

The first time that Father raised any due process issue was in his concise statement of errors complained of on appeal. "Issues not raised in

the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Thus, this issue is waived.

\* \* \*

We are not without a sense of compassion for Father. ***See S.P.***, 47 A.3d at 827. Nonetheless, based on the foregoing, we conclude that none of Father's claims raised on appeal merit relief and that the trial court thereby did not abuse its discretion, make an error of law, nor rely upon insufficient evidence by terminating Father's parental rights to Child. ***See B.J.Z.***, 207 A.3d at 921. "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***Id.*** Accordingly, we affirm.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/27/2019